UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CHRISTINE N. KNIGHT,

                     Plaintiff,

           - against -

MTA – NEW YORK CITY TRANSIT,

                  Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-1428 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Christine N. Knight ("Knight" or "Plaintiff") brings this action against her former

employer, Defendant New York City Transit Authority ("NYCTA" or "Defendant").  Plaintiff

asserts claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York

State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law

("NYCHRL").  Presently before the Court is Defendant's motion for summary judgment and

Defendant's motion to seal and/or redact certain exhibits.  For the reasons that follow, Defendant's

motion for summary judgment is granted, and its motion to seal and/or redact is granted in part

and denied in part.

## BACKGROUND

### I.    Factual Background[1]

       The following facts are undisputed unless otherwise noted.

### A.    Plaintiff's Employment History and Qualifications

       Plaintiff, an African American woman, began working for NYCTA in July 1985.  (*See*

Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1; *see also* Knight Dep. Tr., Dkts. 109-61 & 109-62 ("Knight Dep.

---

[1] Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement
denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to

Tr."), at 104:21–105:2 (Plaintiff describing herself as African American), 274:2–11 (same).) Plaintiff's qualifications include a bachelor's degree in communications from the College of New Rochelle, which she obtained in 1995, and a certificate for women's labor studies from Cornell. (Pl.'s 56.1 ¶ 7.)  Plaintiff also took various technical courses while working at NYCTA.  (*Id.* ¶¶ 7–8.)

During her tenure at NYCTA, Plaintiff held numerous positions, becoming Assistant Transit Management Analyst I on July 10, 1995, Assistant Transit Management Analyst II on February 17, 1997, and Associate Transit Management Analyst on January 25, 1999.  (Dkt. 109-5 at ECF[2] 3–4.)  Plaintiff then held the position of Associate Transit Management Analyst until she retired on February 1, 2021.  (Pl.'s 56.1 ¶ 9.)  According to Plaintiff, in this role, her primary responsibilities "were that of a material forecaster, where Plaintiff did vendor contracts, the gases

---

a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document.  The Court construes any disputed facts in the light most favorable to Plaintiff for purposes of Defendant's summary judgment motion.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, where either party (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in the other's 56.1 statement, the Court may deem any such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d).

Here, for the sake of completeness, the Court primarily cites to Defendant's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 and Response to Plaintiff's Counterstatement, (*see* Dkt. 113), which responds both to Plaintiff's "Response to Defendant's Rule 56.1 Statement" and Plaintiff's own statement of undisputed facts denominated "Plaintiff's Counterstatement Pursuant to Local Rule 56.1(b)" ("Plaintiff's 56.1 Counterstatement"), (*see* Dkt. 110 ("Pl.'s 56.1") at 102).  However, the Court notes that, rather that continuing the numbering used in Defendant's 56.1 Statement, Plaintiff's 56.1 Counterstatement restarts its numbering at paragraph one.  (*See* Pl.'s 56.1 at 102 ¶ 1.)  To avoid confusion, the Court distinguishes between Defendant's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, (Dkt. 113 at 2–165 ("Def.'s 56.1")), and Defendant's Response to Plaintiff's Counterstatement, (Dkt. 113 at 165–228 ("Def.'s Reply 56.1")).

[2] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

contract, car holds, [and] checked on deliveries of wheels and floors to overhaul subway cars for the pneumatic shop." (*Id.* ¶ 12.) Plaintiff also prepared reports and various other contracts. (*Id.* ¶ 13.) At all relevant times, Plaintiff worked at the Coney Island Overhaul Shop Complex ("CIO Shop"), primarily in the Production, Planning and Scheduling ("PPS") Group. (*See* Third Am. Compl. ("TAC"), Dkt. 71, ¶ 7; Knight Dep. Tr. at 111:23–112:15.)

Plaintiff reported to Donald McClean ("McClean") from mid-2014 until October or November 2019. (Def.'s 56.1 ¶ 6.) Thereafter, Plaintiff began reporting to Superintendent Jai Balkaran ("Balkaran") and continued to report to him until her retirement in February 2021. (*Id.* ¶ 7.)

**B.      Plaintiff's Requests for Promotions**

After becoming Associate Transit Management Analyst in 1999, Plaintiff sought various promotions but was never successful. (*See generally* Def.'s 56.1 ¶¶ 9–93.) Between August 2008 and January 2015, Plaintiff applied for or otherwise expressed interest in the following positions: Assistant Vice President, Organizational Development; Manager, Class & Exam; Manager, Civil Service Staffing; Deputy Superintendent, Operations; Principal Transportation Planner; Contract/Purchasing Supervisor; Associate Transit Management Analyst, Subways Department; Director, SMS Production Planning, Budget & Materials; and Senior Quality Control Specialist. (*Id.* ¶¶ 9, 15, 19, 24, 29, 34, 39–40, 44.) Plaintiff's applications were all unsuccessful. (*Id.* ¶¶ 9–44.)

In 2017, Plaintiff applied for the position of Director, Production Planning. (*Id.* ¶ 59.) The job description for the position stated that the position required "[a] bachelor's degree in business, engineering or management science," as well as "[s]ix years of experience in a rapid transit or related industry, three years of which must have been in a supervisory/managerial capacity." (*Id.*

3

¶ 60; Dkt. 107-2 (describing job).)  Plaintiff did not have a degree in business, engineering, or management science and had "never held a management-level position during her employment with" NYCTA.  (Def.'s 56.1 ¶¶ 61–62; *see also id.* ¶ 63 ("[Plaintiff] never had any employees of [NYCTA] reporting to her, other than two to three college interns in the summer or sometime in the fall of 1988 or 1989.").)  Plaintiff was not selected to interview for the Director, Production Planning position.  (*Id.* ¶ 64.)  Patrick Trinchese ("Trinchese"), who has a degree in business management and previously held a managerial position, was ultimately hired for the role.  (*Id.* ¶¶ 66–68.)

Plaintiff applied for several other positions in 2017, including: Superintendent, Transportation, Buses; Office Manager, President's Office; and Special Assistant, President's Office.  (*Id.* ¶¶ 69, 72, 74.)  Plaintiff was not invited to interview for any of these positions.  (*Id.* ¶¶ 71, 73, 75.)  At her deposition in this case, Plaintiff, when asked whether she believed that she was not selected to interview for the Superintendent, Transportation, Buses position because of her race, Plaintiff responded: "No, not in this instance, I don't, because I don't know the department of buses, I've never worked for the department of buses."  (Knight Dep. Tr. at 74:5–9.)  When asked whether she believed that she was not selected to interview for the Superintendent, Transportation, Buses position because of her gender, Plaintiff stated: "No."  (*Id.* at 74:14–16.)  Similarly, Plaintiff indicated that she did not believe that her race or gender had anything to do with the decision not to interview her for the Officer Manager and Special Assistant positions.  (*Id.* at 74:17–76:3, 76:10–77:6.)

By contrast, the Third Amended Complaint, which was filed after Plaintiff's deposition, alleges that numerous White and Hispanic employees with less experience than Plaintiff received promotions while Plaintiff was working at NYCTA.  (TAC, Dkt. 71, ¶ 30.)  The Third Amended

4

Complaint specifically lists seven White and Hispanic employees who were promoted, received salary increases, and were given opportunities to work overtime.  (*Id.*)  Plaintiff did not apply to any of the positions for which these individuals were hired.  (Def.'s 56.1 ¶¶ 77, 80, 83, 86, 88, 91.)  At her deposition, Plaintiff testified that it was part of NYCTA's "culture" that some people were promoted outside of formal application processes, but Plaintiff could not identify anyone in particular who was promoted without applying to a specific position.  (Knight Dep. Tr. at 47:13–48:15.)  Plaintiff also testified that no Black women were promoted to a managerial position during the time she worked with the PPS Group.  (*Id.* at 71:7–12.)

### C.    Plaintiff's Salary and Compensation

From February 1993 to July 1995, Plaintiff "held a union-represented position and was paid in accordance with the applicable union contract."  (Def.'s 56.1 ¶ 98.)  During that period, Plaintiff's "supervisors had no autonomy in setting her salary."  (*Id.*; Franceschini Dep. Tr., Dkt. 106-3, at 81:14–16.)

In July 1995, Plaintiff was appointed to the Assistant Transit Management Analyst I position after taking a civil service exam.  (Def.'s 56.1 ¶ 100.)  Individuals who are appointed to a position after taking a civil service exam receive the minimum salary range for that position.  (*Id.* ¶ 99.)  Consistent with that policy, when Plaintiff was appointed to the Assistant Transit Management Analyst position, she was paid within the minimum salary range for that position at that time.  (*Id.* ¶ 100.)

In 1997 and 1999, Plaintiff was promoted to Assistant Transit Management Analyst II and Associate Transit Management Analyst, respectively.  (*Id.* ¶¶ 2–4, 102.)  When an individual is promoted at NYCTA, that individual receives the minimum salary for that position or a 10% increase over the employee's previous salary, whichever is greater, and there is no discretion to

pay more.  (*Id.* ¶¶ 101, 103.)  Here, the record indicates that when Plaintiff was promoted, she was paid within the minimum salary range for each respective position.  (*Id.* ¶ 102; Franceschini Dep. Tr., Dkt. 106-3, at 84:3–85:7, 88:4–89:5; Dkt. 109-5 at ECF 3–4 (showing Plaintiff's job detail summary, which recorded that she received a greater than 10% increase over her previous salary).)

Employees at NYCTA also receive periodic general wage increases ("GWIs").  (Def.'s 56.1 ¶ 104.)  A GWI is a predetermined percentage increase—usually 2% to 3%—that is given to all NYCTA employees.  (*Id.*)  There is no discretion to award any employee more than the predetermined amount.  (*Id.*)  Plaintiff received 23 GWIs during her tenure at NYCTA.  (*Id.* ¶ 105; *see also* Dkt. 109-5.)[3]

At her deposition, Plaintiff testified that she did not know exactly how salary was determined at NYCTA.  (Knight Dep. Tr. at 101:12–15.)  Nevertheless, Plaintiff explained that "in [her] experience, . . . African Americans . . . remain at the [] bottom of the salary range for their entire tenure, where [W]hite employees are hired mid[-]range or towards the top of the range."  (*Id.* at 101:14–19.)  Later, Plaintiff stated that was "not sure" whether the setting of her salary was discriminatory, but reiterated that her salary was "inferior."  (*Id.* at 104:2–9.)  Plaintiff further testified she did not know who set her salary or who was responsible for determining annual percentage increases to compensation.  (*Id.* at 104:10–20.)

---

[3] Plaintiff contends that her salary history indicates that there was one instance, in September 2014, where she did not receive a GWI to which she was entitled.  (*See* Def.'s 56.1 ¶¶ 104–05 ("Plaintiff's Job Detail Summary shows . . . she did not receive a pay increase from 2013"); Dkt. 109-5 at ECF 3 (Plaintiff's salary history showing no increase between January 1, 2013 and September 20, 2014).)  Plaintiff then received a GWI in December 2014.  (Dkt. 109-5 at ECF 2–3.)  While the circumstances surrounding this discrepancy are unclear, as discussed below, any claim arising out of compensation that Plaintiff received between September 2014 and December 2014 is time-barred.  *See infra* Discussion § I.

D.      **Assignment to African American Supervisor**

From mid-2014 until October or November 2019, Plaintiff reported to McClean, who is African American.  (Def.'s 56.1 ¶¶ 6, 106.)  According to Plaintiff, all of the African American analysts in her group were assigned to report to McClean.  (*See* Knight Dep. Tr. at 104:21–105:16.)  In contrast, Plaintiff testified that she did not know any White analysts that reported to McClean. (*Id.* at 105:17–23.)

Plaintiff did not know why she and the other African American analysts were assigned to report to McClean, nor did she know who made that decision.  (*Id.* at 105:17–106:3.)  However, Plaintiff assumed that Jeffrey Rodgers ("Rodgers"),[4] who is White, had something to do with it because the timing correlated to his promotion to director.  (*See id.* at 106:1–24.)  Rodgers never made any comments about Plaintiff's or anyone else's race or gender.  (*Id.* at 107:11–16, 107:17–19.)  However, Plaintiff thought that Rodgers "had a . . . way about himself that he didn't want to be bothered with [] African American employees," and that "he really didn't like [her], and he made it very clear."  (*Id.* at 107:4–8.)  According to Plaintiff, Rodgers would sometimes move her belongings and barge into her office to use the communal microwave without acknowledging her presence.  (*Id.* at 107:19–109:19.)[5]

In or around October 2019, Plaintiff began reporting to Superintendent Balkaran, who is Indian.  (Def.'s 56.1 ¶ 7.)  Plaintiff continued to report to Balkaran until she retired in February 2021.  (*Id.* ¶ 7.)

---

[4] Plaintiff and Defendant spell this individual's name differently, Plaintiff using "Rogers" and Defendant using "Rodgers."  (Def.'s 56.1 ¶ 109.)  For consistency, the Court adopts the spelling used by Defendant.

[5] Based on Plaintiff's testimony, the Court assumes Plaintiff's office was connected to the employee lunch area.  (Knight Dep. Tr. at 109:1–19.)

### E.        General Issues with Management

Plaintiff alleges that she "was continuously ignored, silenced, and disparaged throughout her tenure with NYCT[A] because of her race and gender."  (TAC, Dkt. 71, ¶ 37.)  For example, Plaintiff alleges that Steve Halvax ("Halvax"), former Assistant Chief Mechanical Officer for the CIO Shop, refused to respond to Plaintiff's outreach to him regarding her concerns about discrimination and "was reluctant to engage in any conversation with Plaintiff, despite the fact that his office was [nearby]."  (*Id.* ¶ 38.)  Although Plaintiff never reported directly to Halvax and did not necessarily have any reason to interact with him on a day-to-day basis, Plaintiff testified that everyone who worked at the CIO Shop "looked to [him] . . . at some point or [] another."  (Def.'s 56.1 ¶ 113; *see also* Knight Dep. Tr. at 111:19–112:10.)

Plaintiff alleges that John Angerami ("Angerami"), another manager, treated her like she was invisible, refused to interact with her, and denied her the resources she needed to perform her job.  (TAC, Dkt. 71, ¶¶ 39–40.)  At her deposition, Plaintiff testified that she "rarely" saw Angerami and that she did not know how often he was in the Coney Island office, but that he spoke to her "as much as he need[ed] to . . . in the position that he [held]."  (Knight Dep. Tr. at 114:23–115:13.)  When asked whether she thought Angerami had ever discriminated against her because of her race or gender, Plaintiff replied: "I think that he has labeled me, and he has marginalized me, and he has been unwilling to help me to be promoted in any [] way."  (*Id.* at 115:14–19.)

Plaintiff also testified that she felt "harassed" due to an incident involving a parking spot.  (*Id.* at 379:2–380:1.)  Plaintiff and several other Black employees used to park in the spot assigned to supervisor McClean because he did not use it every day.  (*Id.* at 379:18–380:2, 380:8–11.)  At some point, Angerami "took the spot" and told McClean that Plaintiff and the other employees could not park there anymore.  (*Id.* at 379:18–20.)  Instead, Angerami "gave the spot to another

8

group that worked in the firing range building and gave it to a worker, a [W]hite male, to park there, to make sure that [Plaintiff] [did not] park there." (*Id.* at 379:18–380:1.)  Plaintiff testified that she thought the decision was made to "inconvenience [her]" and to "block [her] out." (*Id.* at 380:2–7.)

On April 19, 2018, Plaintiff emailed Angerami to request a meeting to discuss "a number of Production Planning and Scheduling operational issues[.]" (Def.'s 56.1 ¶ 124; Dkt. 106-12 at ECF 2 (email exchange between Plaintiff and Angerami).)  Angerami responded that he would be at the Coney Island office the following Friday, on April 27, 2018.  (Dkt. 106-12 at ECF 2.)  The following Friday, on April 27, 2018, Angerami called Plaintiff at 1:20 p.m. and asked to meet with her.  (Dkt. 106-12; Knight Dep. Tr. at 126:6–127:6.)  Plaintiff told Angerami that she was working on something and would meet him at 1:30 p.m.  (Dkt. 106-12; Knight Dep. Tr. at 126:6–127:6.)  By 1:50 p.m., Plaintiff still had not shown up, so Angerami went to another meeting.  (Dkt. 106-12.)  After that meeting, at 2:15 p.m., Angerami called Plaintiff again, but there was no answer. (*Id.*)  Angerami then called Plaintiff's supervisor, who informed him that Plaintiff had already left for the day.  (*Id.*)  On May 10, 2018, Plaintiff emailed Angerami to complain about the fact that he had not met with her yet, accusing Angerami of discrimination and treating her like an afterthought.  (*Id.*)

### F.    Denial of Overtime

In 2017, Plaintiff worked "on a special project" that required her to work overtime.  (Def.'s 56.1 ¶ 129.)  Plaintiff testified that she was not paid the overtime she was owed due to "[her] race and the personal grudge against [her]."  (Knight Dep. Tr. at 146:1–6.)  Plaintiff attributed this to Angerami because she brought the issue to his attention and "he still would not pay [Plaintiff]." (*Id.* at 146:7–15, 147:8–19 (Plaintiff testifying that she actually raised the issue with McClean and

9

Eddie Colon, who was Senior Director at the time, and that they raised it with Angerami, who would not "sign off on the waiver" for her to work more than 4% overtime).)  Plaintiff did not know the exact number of days or hours she worked overtime on the special project, but estimated that "it was roughly over 60 hours that were on different days."  (*Id.* at 147:3–7.)  Plaintiff filed a complaint with the New York State Department of Labor and was ultimately paid.  (*Id.* at 150:6–9; Pl.'s 56.1 ¶ 83.)

Plaintiff also worked overtime as a test monitor on one day in December 2019.  (Knight Dep. Tr. at 157:20–158:18.)  Plaintiff could not recall how many hours she worked.  (*Id.*)  Although Balkaran approved Plaintiff's initial request to work overtime, he would not approve her timesheet.  (*Id.* at 158:19–160:12.)  Plaintiff was "eventually" paid after she spoke with Balkaran's supervisor, George Thomas.  (*Id.* at 160:13–161:23.)

Plaintiff believed the issue was discriminatory "[b]ecause [she] was being hassled, harassed, by management, so [Balkaran] joined in and [] was nitpicking everything and he just didn't pay [her]."  (*Id.* at 161:3–12, 161:19–162:5 (Q. "Why do you believe it was because of your race?" A. "Because there are circumstances and being harassed as a woman, and as a woman of color, and it was a continuance of not being paid again. I wasn't paid for my overtime as a woman and a woman of color . . . . So it was a continuation of me being a woman, working in—in the hostile environment, and being a woman of color . . . .").)[6]

---

[6] Plaintiff's counsel attempts to create a factual dispute by stating that "McClean told Plaintiff that African American employees cannot work overtime."  (Def.'s 56.1 ¶ 132.)  This mischaracterizes Plaintiff's testimony.  Plaintiff actually stated that McClean told her and other members of the PPS Group "who happen[ed] to be of the darker hue[] that [they] couldn't work overtime[.]"  (Knight Dep. Tr. at 154:4–10.)  Thus, McClean told certain African American employees that they could not work overtime; Plaintiff did not testify that McClean told her that African American employees *categorically*, or even *generally*, could not work overtime.

Another reason why Plaintiff thought the issue with her pay was discriminatory was that she is unaware of anyone else having the same issue.  (*Id.* at 162:6–11 ("Q. Other than the fact that . . . you are an African American woman, why do you believe that this had anything to do with your race or your gender? A. Because, to my knowledge, it's not happened to anyone . . . in my group.").)  In contrast, Plaintiff alleges that another employee, an Asian man, was always paid for his overtime hours and was authorized to work the maximum permissible amount, whereas Plaintiff was only authorized to work 4%.  (TAC, Dkt, 71, ¶ 45; Def.'s Reply 56.1 ¶ 80.)  That employee did not report to the same supervisors as Plaintiff, and Plaintiff did not know how many overtime hours he worked between 2017 and 2019, nor did Plaintiff have any personal knowledge concerning the payments he received.  (Def.'s 56.1 ¶¶ 136–38.)[7]

### G.    Transfer of Certain of Plaintiff's Job Responsibilities

In 2018, certain of Plaintiff's job responsibilities were transferred to a White male employee.  (TAC, Dkt. 71, ¶ 49.)  Angerami had received a complaint from Superintendent Steve Dym that Plaintiff was not forecasting as quickly as needed and that Plaintiff was not providing updates.  (Angerami Dep. Tr., Dkt. 106-4, at 80:15–82:8.)  Dym told Angerami that someone else would be performing the forecasting work that Plaintiff had been doing going forward.  (Def.'s 56.1 ¶ 144; Angerami Dep. Tr., Dkt. 106-4, at 80:15–82:8.)  No one told Plaintiff why her forecasting responsibilities had been transferred, but she thought it "was discriminatory towards [her], because [she] had been asking for a promotion."  (Knight Dep. Tr. at 35:17–20, 36:1–23.)

---

[7] At her deposition, Plaintiff also mentioned another non-African American and male employee who worked overtime without any issues.  (Knight Dep. Tr. at 156:21–157:3.)  This second employee also did not report to the same supervisors as Plaintiff, and Plaintiff did not know how many hours he had worked, and she had not seen his time records.  (*Id.* at 157:4–19.)

11

H.        **January 2018 False Accident Report**

In January 2018, Plaintiff called out sick from work for two days because she was sick due to the lack of heat at the office.  (Def.'s 56.1 ¶ 149; Knight Dep. Tr. at 129:23–130:2 ("Q. And you were sick because of the lack of heat at the office, correct? A. Because of working in[—]without the benefit of heating."), 131:3–5 ("I got sick because I was working without the benefit[—]in the dead of winter, working without the benefit of being in a heated place.").) McClean would not sign a sick form for Plaintiff, and instead filled out an "On the Job Injury Form" on Plaintiff's behalf.  (Def.'s 56.1 ¶ 148; *see* Dkt. 106-13 (On the Job Injury Form).) Plaintiff did not want to fill out the On the Job Injury form because she was not injured and refused to sign it.[8]  (Knight Dep. Tr. at 132:3–133:20.)  Plaintiff did not think that McClean filling out the form was discriminatory, but thought it was inappropriate and problematic.  (*Id.* at 133:7–9 ("I never alleged that [McClean] filling this form out was discriminatory.  It was inappropriate . . . ."), 133:24–134:5 ("I think that it could have been handled in a much better manner . . . . I've never had someone to fill such a form out for me and try to force me to sign it.  So, yeah, it was problematic.").)  Plaintiff was ultimately paid for the sick time, and nothing happened to her as a result of her refusal to sign the form.  (*Id.* at 135:17–136:4.)

I.        **Sick Day in September 2019**

Plaintiff was out of the office on September 26, 2019.  (Def.'s 56.1 ¶ 159.)  Although Plaintiff informed a co-worker that she was going to be out sick that day, she did not inform her supervisor, McClean, directly.  (Knight Dep. Tr. at 141:4–9.)  McClean emailed Knight stating: "I have not seen nor heard from you during your scheduled work tour today.  I need to receive a

---

[8] Plaintiff had previously completed the same form when she was injured at work in another instance.  (Knight Dep. Tr. at 131:13–23.)

communication regarding your whereabouts as soon as possible."  (Dkt. 106-14 (email from McClean).)  Although McClean initially marked Plaintiff as AWOL because he had not heard from her, (Def.'s 56.1 ¶ 162), Plaintiff was ultimately paid for that day, (Knight Dep. Tr. at 143:21–23).

### J.     COVID-19 Pandemic and After

On March 15, 2020, in light of the COVID-19 pandemic, NYCTA issued a memorandum directing all nonessential employees to stay home starting March 16, 2020, "for two weeks or until directed otherwise."  (Dkt. 106-15 (March 15, 2020 memorandum).)  The memorandum further stated: "To the extent that a non-essential employee can telecommute, they should do so. . . . All telecommuting employees will need to sign a Telecommuting Agreement."  (*Id.*)  The Telecommuting Agreement provided in relevant part:

> Employee understands and agrees that telecommuting is not a right or benefit of his or her employment . . . . This agreement does not create a general right for the Employee . . . to telecommute. . . .
>
> Employee time and attendance for performing work duties will be recorded in accordance with [NYCTA] policies and procedures.  Employees will adhere to all recordkeeping requirements and procedures for requesting paid and unpaid time off . . . as if he/she were reporting to work at a [NYCTA] facility. . . .
>
> Employee will provide at his/her own expense appropriate computer hardware or software to conduct business effectively. . . . Employee agrees to notify [NYCTA] of any malfunction of equipment that would impede the Employee's ability to perform his/her duties. . . .
>
> Employee is further required to have some type of voice mail, call waiting, or answering machine to ensure that all work-related calls coming into the home office location are received by the Employee. . . .
>
> The Employee understands that violation of this Agreement may result in disciplinary action up to and including termination of employment.

(Dkt. 107-13 at ECF 3 (Telecommuting Agreement).)

Plaintiff signed the Telecommuting Agreement on March 13, 2024, despite the fact that she did not have a computer, Wi-Fi, or voicemail capability at the time. (Def.'s 56.1 ¶¶ 170, 172–

73.)   Because Plaintiff did not have the equipment necessary to telecommute, Plaintiff was physically present at the office from March 16, 2020 through March 18, 2020.  (Knight Dep. Tr. at 169:8–21.)[9]  Plaintiff felt like she "was being punished for not having equipment to perform telework at a most unexpected time[.]"  (*Id.* at 170:15–17.)  Plaintiff is not aware of any other NYCTA employee who did not have access to a computer or Wi-Fi but was permitted to telecommute.  (*Id.* at 170:20–23.)

On March 18, 2020, Plaintiff was informed that she could begin working from home the following day, on March 19, 2020, even though she did not have the required equipment to do so.  (Dkt. 106-17 at ECF 2 (March 18, 2020 email to Plaintiff).)  In the morning of March 18, 2020, while Plaintiff was physically present at the office, Balkaran sent Plaintiff a manual assignment that she could print and complete at home without a computer.  (Def.'s 56.1 ¶¶ 176–77; *see also* Dkt. 106-17 at ECF 2 (email sent to Plaintiff on March 18, 2020, at 11:12 a.m. granting Plaintiff permission to telecommute and instructing her to print out and manually complete assignment); Dkt. 106-18 (email sent to Plaintiff on March 18, 2020, at 6:53 a.m. with attachment to print out for manual assignment); Knight Dep. Tr. at 169:8–13 (Plaintiff's testimony that she was physically present in the office on March 18, 2020).)

NYCTA provided Plaintiff with a laptop as an accommodation on April 22, 2020.  (Knight Dep. Tr. at 179:4–7.)  However, Plaintiff had ongoing issues accessing the programs she needed to complete her work.  (*Id.* at 187:1–6.)  Balkaran, Plaintiff's supervisor, was "trying to troubleshoot" the computer issues that Plaintiff was experiencing.  (*Id.* at 187:1–10.)  Plaintiff's computer issues were still ongoing as of October 2020.  (Dkt. 106-28 (email from Plaintiff to

---

[9] It is unclear why Plaintiff did not stay at home without telecommuting and whether she was not permitted to do so.

Angerami dated October 13, 2020 noting Plaintiff's "various established, on-going and unresolved technical problems").)  One reason why Plaintiff was having laptop issues is because employees were required to use dual authentication to log onto NYCTA's program and databases, and Plaintiff refused to download the dual authentication application onto her cell phone until November 2020.  (*See* Balkaran Dep. Tr., Dkt. 114-2, at 112:7–113:4 (Balkaran testifying that the "main reason" why Plaintiff could not do her job remotely was due to her failure to comply with the dual authentication requirement); *see also* Knight Dep. Tr. at 180:7–182:7 (Plaintiff testifying that "[she] didn't understand the whole concept of [the dual authentication application], and it made [Plaintiff] feel as if that was invading the personal information [on her] phone").)

In or around August 2020, employees were notified that they would be returning to the office on an A/B schedule, meaning that they would work in the office on some days and telecommute on other days.  (Knight Dep. Tr. at 185:15–22.)  Employees were required to submit a weekly telecommuting work plan to their supervisor before telecommuting.  (Def.'s 56.1 ¶¶ 188–89.)  Plaintiff was informed of this requirement.  (Knight Dep. Tr. at 185:23–186:2.)  Due to the ongoing issues she was having with her laptop, Plaintiff did not submit her telecommuting work plan every week.  (*Id.* at 186:19–187:6.)  Balkaran emailed Plaintiff asking her to submit her telecommuting work plan on August 25, 2020, September 14, 2020, September 25, 2020, and September 30, 2020.  (Def.'s 56.1 ¶ 190.)

Plaintiff was out of the office from September 29 to October 12, 2020, for pre-planned elective knee surgery.[10]  (Def.'s 56.1 ¶¶ 192–93.)  Balkaran emailed Plaintiff on October 16, 2020,

---

[10]  Although the parties dispute whether Plaintiff orally informed Balkaran about the surgery in advance, it is undisputed that Plaintiff did not submit any documentation or seek a leave of absence prior to the surgery, and that she only submitted a Leave of Absence Due to Illness application upon her return and without providing any medical documentation.  (Def.'s 56.1 ¶ 194; Dkt. 106-25 (application for leave of absence due to illness dated October 27, 2020); Dkt. 107-31

stating: "To date, I have not received either your teleworking plan, nor your update.  You are now placed on notice that I must receive all outstanding plans and updates by close of business today, Friday, October 16, 2020.  Your failure to submit these documents may subject you to appropriate action."  (Dkt 107-17 (October 16, 2020 email from Balkaran to Plaintiff).)  On October 20, 2020, Balkaran emailed Plaintiff again:

> Please be advised that I have not received your 'Telecommuting Work Plan' to date.  You were physically present at your office in Coney Island yesterday with access to NYCT[A] computer and email system to complete the work plan to be approved for Telecommuting.  I sent you an email last Friday . . . that you were placed on notice & that I must receive all outstanding plans and updates by close of business [that day].

(Dkt. 107-18 (October 20, 2020 email to Plaintiff).)

On October 28, 2020, Plaintiff's telecommuting privileges were revoked.  (Def.'s 56.1 ¶¶ 203–04; *see also* Dkt. 106-29.)  The memorandum revoking Plaintiff's telecommuting privileges explained that Plaintiff could reapply for telecommuting approval after she "resolve[d] all telecommuting issues with IT and provide[d] the required telecommuting plans and demonstrate[d] [her] ability to complete [her] assignments [sic] remotely[.]"  (Dkt. 106-29.)  Plaintiff refused to sign the memorandum, (*see* Def.'s 56.1 ¶ 205), and believed the revocation of her telecommuting privileges was in retaliation for her ongoing computer issues, (Knight Dep. Tr. at 194:8–19).

Balkaran was away for a little over a week in November 2020, and Plaintiff was told to report to Trinchese in Balkaran's absence.  (Def.'s 56.1 ¶ 211.)  Between November 10, 2020, and November 16, 2020, Trinchese reached out to Plaintiff four times to check in with her, inquire as to her whereabouts, and ask whether she was working.  (*See* Dkt. 107-20 (Trinchese emailing Plaintiff: "Good morning Chris are you in today? I have not heard from you . . . ."); Dkt. 106-30

---

(NYCTA policy permitting medical documentation to be submitted within three days of employee's return to work).)

("Chris it is 7:15 a.m. and you have not checked in nor have you checked in or acknowledged your emails regarding such all week . . . ."); Dkt. 106-31 (similar).)  Plaintiff did not respond nor otherwise contact Trinchese to tell him that she was logged in and working during that period. (Def.'s 56.1 ¶ 217.)

On November 16, 2020, a Notice and Statement of Charges ("November 2020 OATH Charge") was issued to Plaintiff.  (Dkt. 107-21.)  Among other things, the November 2020 OATH Charge was based on Plaintiff's failure to: (1) submit her required weekly telework plan; (2) submit requested medical certification for her ten-day absence from September 29 to October 12, 2020; and (3) perform assigned duties, respond to work-related emails, and verify her attendance to Trinchese while Balkaran was away in November 2020.  (Dkt. 107-21 at ECF 6.)

On or about November 12, 2020, Plaintiff submitted a letter from a medical provider at Select Medicine to Balkaran and Angerami.  (Def.'s 56.1 ¶ 218; Dkt. 108-6.)  The letter identified Plaintiff as "at high risk for COVID-19" "[d]ue to medical conditions including age over 65," and requested that Plaintiff be permitted to work from home "until further notice."  (Def.'s 56.1 ¶ 218.) Angerami told Plaintiff to fill out a form to work remotely.  (Knight Dep. Tr. at 276:6–13.)[11] Plaintiff did not fill out the form due to the "circumstances" she was experiencing with her laptop. (Def.'s 56.1 ¶¶ 220–21; Knight Dep. Tr. at 276:14–20.)  Although Plaintiff was "not sure" whether

---

[11] This is one of many instances in which Plaintiff's counsel mischaracterizes Plaintiff's deposition testimony and other evidence in the record in responding to Defendant's 56.1 Statement. (*See* Def.'s 56.1 ¶ 219.)  Plaintiff's counsel "disputes" that Plaintiff was advised to fill out a job form to work remotely by taking out of context Plaintiff's testimony that she was not sure what the form was called.  (Knight Dep. Tr. at 276:10–13 (Plaintiff testifying: "I think [Angerami] responded, an email, but I'm not sure, to do a—I can't remember what you call it—to fill out a job form for—to work remotely").)  In context, Plaintiff's testimony makes clear that she was instructed to fill out a telework request form.  (*Id.* at 276:14–20 ("Q: Did you fill out that form? A. No. . . . [B]ecause of the circumstances that I was experiencing with my laptop . . . I couldn't just fill a form out . . . .").)  The Court is troubled by Plaintiff's counsel's repeated attempts to create a genuine issue of material fact by misstating the record.

Angerami's request that Plaintiff complete a telework request form was discriminatory, she believed that it was "retaliatory" because it was a continuation of "management" not "tak[ing] [her] situation seriously" or "car[ing] about . . . [her] safety." (Knight Dep. Tr. at 281:16–282:16.) Plaintiff was unsure whether Balkaran responded to the letter, but felt like his response (or lack thereof) was discriminatory because it showed "he was part of a gang of men at work who were harassing [Plaintiff] or really didn't care about [her] well-being." (*Id.* at 282:17–283:11.) Similarly, Plaintiff felt like Balkaran's response was retaliatory because it made her feel "invisible or unimportant, insignificant, because there was no response or raised concern about [her] condition." (*Id.* at 284:9–14.) Plaintiff is not aware of anyone who was permitted to work from home solely because they were over the age of 65 or because they were African American. (Def.'s 56.1 ¶¶ 228–29.) However, a Black male employee was permitted to work remotely full-time due to his (unspecified) health conditions. (Angerami Dep. Tr., Dkt. 109-63, at 26:4–10.)[12]

On December 17, 2020, Plaintiff emailed Balkaran to let him know that she had resolved her ongoing IT issues and was now able to connect remotely. (Dkt. 107-22.) Balkaran emailed Plaintiff back to remind her that she had not been authorized to work remotely and that she would have to reapply for telecommuting privileges. (Dkt. 107-22.) On December 18, 2020, Thomas emailed Plaintiff instructing her to submit her teleworking plan to Balkaran for approval. (Dkt. 106-33.) Also on December 18, 2020, Plaintiff emailed Balkaran and informed him that she still did not have access to certain programs—CMS and Talon[13]—on her laptop. (Dkt. 106-34.)

---

[12] Other than noting the fact that such an employee exists, Plaintiff does not point to any evidence in the record regarding the employee's health conditions or how he obtained approval to work remotely. (*See generally* Pl.'s 56.1.)

[13] Neither party explains what CMS and Talon are used for, but the Court infers from the communications between Plaintiff and her supervisors, discussed next, that the ability to access and use these programs was essential to Plaintiff's job.

Balkaran responded: "Chris, Your job is to do forecasting for the motor shop and you need CMS and Talon to do it. You must have those programs to be able to work remotely.  You need to take your laptop to Coney Island so IT can load the short cut." (Dkt. 106-34.)  On December 24, 2020, Plaintiff finally submitted a telecommuting plan, which Balkaran approved. (Dkts. 106-35, 107-23.)  Then, on December 30, 2020, Plaintiff advised Thomas and Balkaran that she was still having issues with her laptop. (Dkt. 107-24.)  Again, Plaintiff was informed that she would have to report to the Coney Island office until her laptop issues were resolved. (Dkt. 107-24.)

The following day, on December 31, 2020, Plaintiff emailed Joel Andrews ("Andrews"), Vice President, Equal Opportunity and Diversity, regarding various concerns that she had. (Def.'s 56.1 ¶ 239; Dkt. 109-46.)  Among other things, Plaintiff stated that "[she] was singled out . . . and forced to report to work although every other employee in my rank and file of Analyst, were released from work to home on March 16th, 2020." (Dkt. 109-46 at ECF 2.)  Plaintiff accused Balkaran, Angerami, and Thomas of discrimination and harassment. (*Id.*)

On January 4, 2021, Richard Gorman, Assistant Vice President, Human Resources Operations, emailed Plaintiff forms for requesting a reasonable accommodation. (Dkt. 106-36.)  Plaintiff did not respond. (Def.'s 56.1 ¶ 241.)  On January 6, 2021, Doris Lindberg ("Lindberg"), Senior EEO Investigator, emailed Plaintiff to arrange an interview regarding the issues Plaintiff had raised in her email to Andrews. (Dkt. 107-26.)  Plaintiff did not respond until January 27, 2021, when she emailed Lindberg to inform her that she (Plaintiff) was "in the process of vacating [her] position . . . [and] therefore [would] not require further assistance." (Dkt. 107-26.)

In fact, Plaintiff did not have any communication with anyone at NYCTA between December 31, 2020 and January 27, 2021. (Def.'s 56.1 ¶ 244.)  During that time, Plaintiff did not report for work and left her work-issued laptop in a drawer in her office. (*Id.* ¶¶ 244, 251.)  At

19

some point, Plaintiff informed her supervisors that she was sick.  (Knight Dep. Tr. at 358:1–23.)

On January 4, 2021, Plaintiff's daughter also emailed Balkaran stating that Plaintiff was sick.  (Dkt.

109-28.)  Plaintiff did not, however, have an approved leave of absence.  (*See* Knight Dep. Tr. at

358:1–23; *see also* Dkt. 107-31 at ECF 3 (sick leave policy noting that an employee must notify

NYCTA at least one hour prior to the employee's "tour of duty" and must include the "anticipated

duration of the absence").)  Thus, on January 6, 2021, Balkaran directed Knight to contact

Employee Relations to explain her "AWOLs."  (Dkt. 107-27.)  Plaintiff was not paid during this

period.  (Def.'s Reply 56.1 ¶ 147.)

On January 19, 2021, an Amended Notice and Statement of Charges ("January 2021 OATH

Charges") was issued to Plaintiff.  (Dkt. 107-28.)  Among other things, the January 2021 OATH

Charge was based on Plaintiff's failure to: (1) submit her required weekly telework plan in

December; (2) report to the Coney Island office as directed while her computer issues remained

unresolved; and (3) contact labor relations to explain her AWOLs.  (Dkt. 107-28.)

On January 27, 2021, Balkaran emailed and instructed Plaintiff to "get clearance from

Labor [R]elations before reporting to duty."  (Dkt. 106-37.)  Plaintiff arrived at the Coney Island

office that day without having obtained clearance.  (Def.'s 56.1 ¶¶ 252–53.)  Plaintiff was told to

leave the premises and meet with Labor Relations, which was located in another office.  (*Id.* ¶

353.)  Later that day, Plaintiff and her attorney met with Labor Relations to discuss her AWOLs.

(*Id.* ¶ 257.)  The following day, on January 28, 2021, the locks were changed on Plaintiff's office

door.  (*Id.* ¶ 258.)

### K.    Plaintiff's Retirement

Plaintiff retired from NYCTA on February 1, 2021.  (*Id.* ¶ 271.)  Plaintiff felt forced to

resign due to pressure and harassment by management, NYCTA's alleged lack of COVID-19

policies, her ongoing laptop issues, the OATH charges, her general feeling that she was being ignored by various supervisors and managers, and health-related issues that arose from the stress and anxiety of her circumstances at work.  (*Id.* ¶ 272.)  No one ever explicitly told Plaintiff to retire, but at some point around January 2020, Andrews (Vice President, Equal Opportunity and Diversity) remarked that "[Plaintiff] had been [at NYCTA] a long time" and suggested that "[she] might think about packing it in."  (*Id.* ¶¶ 273–77; Knight Dep. Tr. at 360:13–361:4.)

## L.    Discriminatory and Retaliatory Comments

Balkaran made two comments to Plaintiff that she believed to be discriminatory and retaliatory.  First, in or around October 2020, Balkaran commented about a "Tyler Perry movie about an angry [B]lack woman."  (Knight Dep. Tr. at 220:17–221:8.)  Plaintiff "decoded" the comment as a reference to herself.  (*Id.*)  During the same conversation, Balkaran also asked Plaintiff: "If you had [to do it] over, would you still sue transit?"  (*Id.* at 216:14–21.)[14]

---

[14] Around the same time, Plaintiff's co-worker, Mary Johnson, told Plaintiff that Balkaran had asked Johnson, another Black employee: "Why are [B]lack women so difficult?"  (*See also* Knight Dep. Tr. at 219:4–21.)  Plaintiff believes the comment was in reference to her.  (*Id.* at 220:3–6.)  As Defendant points out, Johnson's comment is inadmissible hearsay because there is no indication that Johnson will testify at trial; that is, it would be hearsay for Plaintiff to testify that Johnson told her that she had this conversation with Balkaran. As such, the Court does not consider it.  *See Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 459 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014) (summary order); *Friedman v. Swiss Re Am. Holding Corp.*, 643 F. App'x 69, 71 (2d Cir. 2016) (summary order). Although Plaintiff argues that the Court should consider Johnson's comment because Plaintiff has identified Johnson as a possible trial witness in this case, (*see* Def.'s 56.1 ¶ 260), there is no guarantee that Johnson would be available to testify at trial or that Johnson's testimony would be consistent with Plaintiff's.  *See Pavlica v. Behr*, No. 03-CV-9628 (DC), 2005 WL 3181586, at *2 (S.D.N.Y. Nov. 29, 2005) (explaining that "[t]he mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage" (internal quotation marks omitted)); *Manville v. Town of Greece*, 892 F. Supp. 2d 469, 478 (W.D.N.Y. 2012) (same).

### M.      Plaintiff's Complaints of Discrimination

Plaintiff made several formal and informal complaints of discrimination during her employment at NYCTA.  In August 2014, Plaintiff filed a charge of discrimination with the New York State Division of Human Rights and the Equal Employment Opportunity Commission ("EEOC").  (Dkt. 106-38.)  In her complaints, Plaintiff asserted that she had been discriminated against based on her race and sex by Rodgers, who allegedly ignored, stereotyped, and overlooked her.  (*Id.*)  On or about January 5, 2016, the EEOC issued a dismissal and a notice of rights letter.  (Dkt. 106-39.)  Plaintiff filed a second charge with the EEOC on May 30, 2018, similarly alleging discrimination and retaliation by her supervisors.  (Dkt. 106-40.)  The EEOC issued a dismissal and notice of rights letter as to that complaint on December 7, 2018, (Dkt. 106-41), and Plaintiff subsequently filed the present lawsuit on March 12, 2019, (Compl., Dkt. 1).  Plaintiff also made numerous internal complaints regarding discrimination and retaliation during her employment at NYCTA.  (*See* Pl.'s 56.1 ¶¶ 50–78, 81–98, 101–04.)

## II.      Procedural History

Plaintiff, proceeding *pro se*, filed this action against NYCTA, the Metropolitan Transportation Authority Inspector General, and various individual defendants on March 12, 2019.  (*See* Compl., Dkt. 1.)  In April and May of 2019, Defendants moved to dismiss Plaintiff's Complaint for failure to state a claim.  (*See* Dkts. 5, 7, 12–15.)  After holding oral argument on Defendants' motions, the Court dismissed all Defendants other than NYCTA from the case, and granted Plaintiff leave to file an amended complaint.  (*See* 7/10/2019 Min. Entry.)  On August 12, 2019, Plaintiff filed an Amended Complaint, (*see* Dkt. 17), which Defendant NYCTA answered on August 30, 2019, (Dkt. 19).

The case proceeded to discovery. (*See, e.g.*, 1/30/2020 Docket Order.) On March 10, 2020, counsel from Advocates for Justice appeared on Plaintiff's behalf. (*See* Dkts. 35, 37; 3/10/2020 Docket Order.) Subsequently, on April 30, 2020, Plaintiff filed a Second Amended Complaint, (Dkt. 41), which Defendant answered on May 29, 2020, (Dkt. 45). Discovery continued through June 2021, during which time the Honorable Lois Bloom, Magistrate Judge, resolved numerous discovery disputes between the parties and granted several extensions of discovery deadlines. (*See, e.g.*, 11/23/2020 Docket Order; 1/11/2021 Docket Order; 5/18/2021 Docket Order; 6/24/2021 Docket Order.)

On July 6, 2021, Plaintiff moved to amend her Second Amended Complaint. (Dkt. 60.) Defendant opposed the request. (Dkt. 61.) The undersigned referred the motion to Judge Bloom, (7/22/2021 Docket Order), who recommended that the motion be granted in part and denied in part, (Dkt. 70). On October 14, 2021, after receiving no objections from the parties, the Court adopted Judge Bloom's Report and Recommendation in its entirety. (10/14/2021 Order Adopting R. & R.) Plaintiff filed a Third Amended Complaint on October 20, 2021, (TAC, Dkt. 71), which Defendant answered on October 27, 2021, (Dkt. 72). The Third Amended Complaint asserts causes of action under Title VII, the NYSHRL, and the NYCHRL.[15] (TAC, Dkt. 71, ¶¶ 163–81.)

---

[15] Despite its (single) reference to 42 U.S.C. § 1981, (*see* TAC, Dkt. 71, ¶ 1 ("This is an employment discrimination case brought pursuant to [Title VII] and 42 U.S.C. § 1981 . . . .")), the Third Amended Complaint cannot fairly be interpreted as asserting a claim under that statute. *See Aycock v. Bank of Am.*, *N.A.*, No. 14-CV-2789, 2015 WL 3746997, at *5 (W.D. Tenn. May 28, 2015) ("[M]ere references to statutes, without an explanation of which factual allegations supposedly support a claim under the statutes, are not sufficient to state a cause of action."); *Ercole v. LaHood*, No. 07-CV-2049 (JFB) (AKT), 2011 WL 1205137, at *11 (E.D.N.Y. Mar. 29, 2011) (complaint that made passing reference to statute failed to assert a cause of action under that statute), *aff'd*, 472 F. App'x 47 (2d Cir. 2012) (summary order). Accordingly, the Court declines to address Plaintiff's arguments regarding the viability of such a claim. *See Trachtenberg v. Failedmessiah.com*, 43 F. Supp. 3d 198, 206 (E.D.N.Y. 2014) ("[A]n opposition cannot be used to amend a complaint.").

After several more discovery disputes, (*see, e.g.*, 5/23/2022 Docket Order; 6/9/2022 Docket Order), Defendant requested a pre-motion conference ("PMC") to discuss an anticipated motion for summary judgment. (*See* Dkt. 78.) The Court denied the PMC request as unnecessary, (7/25/2022 Docket Order), and adopted the briefing schedule proposed by the parties, (8/6/2022 Docket Order). On October 7, 2022, Defendant served its motion for summary judgment on Plaintiff, along with a motion to seal certain of its motion papers. (*See* Dkt. 82.)

Plaintiff requested several extensions, which the Court granted. (*See* Dkts. 84–88.) Then, on March 15, 2023, Plaintiff's counsel filed a letter stating that there had been a breakdown in their relationship with Plaintiff and requesting additional time to respond to Defendant's motion for summary judgment so that Plaintiff could find new counsel. (Dkt. 90; *see also* Dkts. 93, 95, 97.)[16] The Court granted Plaintiff six weeks to find new counsel, stayed the case in the interim, and set a new deadline for Plaintiff's opposition brief. (*See* 3/16/2023 Docket Orders.) On April 7, 2023, Kevin S. Johnson of the Hamra Law Group, P.C., filed an appearance on behalf of Plaintiff. (Dkt. 91.) Then, on April 27, 2023, Plaintiff filed a letter stating that Mr. Johnson had "ghosted [her] for weeks and wouldn't provide any updates and/or information as to what was going on." (Dkt. 92.) The Court granted Plaintiff another extension to June 22, 2023, but warned Plaintiff that no further extensions would be granted. (5/1/2023 Docket Order.) On May 19, 2023, Rudy A. Dermesropian filed an appearance on behalf of Plaintiff, (*see* Dkt. 98), and requested an extension of time to file Plaintiff's opposition brief, (*see* Dkt. 99). Once again, the Court granted Plaintiff's extension request, but warned that no further extensions would be granted. (5/22/2023

---

[16] The Court does not recite the details of the dispute between Plaintiff and her Advocates for Justice attorneys in full as it is not relevant to the disposition of Defendant's present motions.

Docket Order.)  Plaintiff finally served her opposition on July 24, 2023, (*see* Dkt. 101), and the motion was fully briefed on August 24, 2023, (*see* Dkts. 103–115).

## SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact," and, thus, that the party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

"The moving party bears the burden of showing that he or she is entitled to summary judgment." *Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 267 (E.D.N.Y. 2008).  Where the defendant is the moving party, there is "no express or implied requirement" that the defendant "negat[e] the [plaintiff's] claim" with evidence of its own, as long as it "point[s] out to the district court . . . that there is an absence of evidence to support the [plaintiff's] case." *Celotex Corp.*, 477 U.S. at 323, 325 (emphasis omitted).  Once a defendant has met this burden, the plaintiff must "do[] more than simply rely on the contrary allegation[s] in her complaint," *Adickes*, 398 U.S. at 160, and "go beyond the pleadings" to "designate specific facts showing that there is a genuine issue for trial," *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that a non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment).

**DISCUSSION**

**I.     Plaintiff's Untimely Claims**

For a Title VII discrimination claim to be timely, a plaintiff must file a charge with the EEOC or a state or local anti-discrimination agency within 300 days of the alleged discriminatory act.  *See* 42 U.S.C. § 2000e-5(e)(1); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 680 (S.D.N.Y. 2012).  "This statutory requirement effectively acts as a statute of limitations, and Title VII claims are barred by the failure to file a timely charge."  *Davis-Bell*, 851 F. Supp. 2d at 680 (quoting *Hill v. Citibank Corp.*, 312 F. Supp. 2d 464, 472 (S.D.N.Y. 2004)); *see Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").  One exception to this rule is the continuing violation doctrine, under which "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."  *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155–56 (2d Cir. 2012) (internal quotation marks omitted).  It is well-established, however, that the continuing violation doctrine does not encompass "discrete acts" such as an employer's failure to promote for the purposes of a Title VII claim.  *Accord Chin*, 685 F.3d at 156 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 14 (2002)).  Rather, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."  *Morgan*, 536 U.S. at 113; *see also Chin*, 685 F.3d at 157 ("Discrete acts . . . , which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period.").

26

Discrimination claims under the NYSHRL and NYCHRL are subject to a three-year statute of limitations. *Davis-Bell*, 851 F. Supp. 2d at 680 (citing N.Y. C.P.L.R. § 214; N.Y.C. Admin. Code § 8-502(d)). "However, the statute of limitations 'is tolled for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter.'" *Mohamed v. NYU*, No. 14-CV-8373 (GBD) (MHD), 2015 WL 5307391, at *3 (S.D.N.Y. Sept. 10, 2015) (quoting *DeNigris v. N.Y.C. Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 192 (S.D.N.Y.2012)).  Although "the continuing violation[] doctrine of the NYSHRL mirrors that of Title VII," New York state courts have applied a "more generous" continuing violation doctrine to NYCHRL claims. *Taylor v. City of New York*, 207 F. Supp. 3d 293, 302–03 (S.D.N.Y. 2016) (citing *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013)).  Under the NYCHRL, "[o]therwise time-barred discrete acts can be considered timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Sotomayor*, 862 F. Supp. 2d at 250 (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)); *see also Taylor*, 207 F. Supp. 3d at 302–03 ("Discrete acts such as failures to hire can accordingly trigger the NYCHRL's continuing violations doctrine where they can be shown to be the result of a discriminatory policy or practice.").

Here, Plaintiff filed a charge with the EEOC on May 30, 2018,[17]  (Dkt. 106-40), and the EEOC issued a right-to-sue letter 191 days later, on December 7, 2018, (Dkt. 106-41).  Under the

---

[17] That Plaintiff filed an earlier discrimination charge with the EEOC in 2014 has no bearing on the Court's analysis.  (*See* Dkt. 106-38.)  Plaintiff received a right-to-sue letter in connection with that charge on or around January 5, 2016, (Dkt. 106-39), which means any lawsuit arising out of that charge would had to have been filed by April 4, 2016.  *See Bamba v. Fenton*, 758 F. App'x 8, 10 (2d Cir. 2018) (summary order) ("A lawsuit based on a Title VII claim must be filed within 90 days of receiving a right-to-sue letter from the EEOC." (citing 42 U.S.C. § 2000e-5(f)(1))).  Thus, "Plaintiff's continuing violation claim cannot revive her

aforementioned time limits, any Title VII claims regarding discrete acts of alleged discrimination that occurred prior to August 3, 2017 (300 days before Plaintiff filed the EEOC charge), are time-barred, as are any NYSHRL and NYCHRL claims regarding discrete acts of alleged discrimination that occurred before September 3, 2015 (three years and 191 days before Plaintiff filed suit on March 12, 2019).   Thus, Plaintiff's failure-to-promote claims as to the following positions are untimely: (1) Assistant VP, Organizational Development (applied for in August 2008); (2) Manager, Class & Exam (April 2011); (3) Manager Civil Service Staffing (June 2011); (4) Deputy Superintendent, Operations (July 2011); (5) Principal Transportation Planner (April 2012); (6) Contract/Purchasing Supervisor (March 2013); (7) Associate Transit Management Analyst (March 2013); (8) Director, SMS Production Planning, Budget & Materials (March 2013); and (9) Senior Quality Control Specialist II (January 2015).  *See supra* Background § I.B.

Plaintiff's contention that the continuing violation doctrine saves her failure-to-promote claims regarding the positions she applied for between August 2008 and January 2015 is unpersuasive.  (*See* Pl.'s Mem. in Opp'n to Def.'s Mot., Dkt. 111 ("Pl.'s Mem."), at 7–9.)  As noted, the continuing violation doctrine does not apply to discrete acts such as a failure to hire or promote under either Title VII or the NYSHRL.  *See Chin*, 685 F.3d at 156; *Taylor*, 207 F. Supp. 3d at 302–03.  And though the continuing violation doctrine is more "expansive" under the NYCHRL, here, the record fails to show that the discrete acts complained of were the result of a discriminatory policy or practice.  *See Taylor*, 207 F. Supp. 3d at 302–03; *Villar v. City of New York*, 135 F. Supp. 3d 105, 129 (S.D.N.Y. 2015).  Aside from conclusory assertions, Plaintiff has presented no evidence that her attempts for promotion were unsuccessful due to a specific ongoing

---

otherwise barred claim where she opted not to act within 90 days of her [2016] EEOC right-to-sue letter."  *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 207 (E.D.N.Y. 2014).

race- or sex-based discriminatory policy or practice, and, as discussed below, Plaintiff has failed to adduce sufficient facts to establish a prima facie case as to those promotions she sought within the applicable statute of limitations. *See Villar*, 135 F. Supp. 3d at 129 (dismissing discrimination claim as untimely under the NYCHRL where Plaintiff presented no evidence that the alleged discriminatory conduct was the result of a specific ongoing discriminatory policy or practice); *Richard v. N.Y.C. Dep't of Educ.*, No. 16-CV-957 (MKB), 2017 WL 1232498, at *7 (E.D.N.Y. Mar. 31, 2017) (noting that the continuing violation exception "presumes that a plaintiff challenged at least one act related to the allegedly discriminatory policy within the 300-day limitations period"); *see also infra* Discussion § II.B.1 (dismissing Plaintiff's timely failure-to-promote claims).

## II.     Plaintiff's Timely Title VII and NYSHRL Claims

### A.     Legal Standard

Courts apply the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green* to discrimination claims under Title VII and the NYSHRL. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 323–24 (S.D.N.Y. 2020). Under this framework, "[f]irst, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981)). To make out a prima facie case of discrimination at this stage of the litigation, a plaintiff must raise a genuine question of material fact "by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015)

(quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).  Put another way, to overcome summary judgment on a disparate treatment discrimination claim, a plaintiff must raise a genuine issue of material fact as to whether their membership in a protected class was a "'substantial' or 'motivating' factor contributing to the employer's decision to take the [adverse] action." *See id.* at 85 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 249 (1989) (plurality opinion)).  After a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See id.* at 83; *McDonnell Douglas*, 411 U.S. at 802.  The burden then shifts back to the plaintiff to present evidence that the employer's reason was merely a pretext for discrimination *or* that the employer was motivated at least in part by discriminatory motives. *See Bart v. Golub Corp.*, 96 F.4th 566, 567 (2d Cir. 2024) (explaining that a plaintiff may satisfy the third stage of the *McDonnell Douglas* burden-shifting test by demonstrating "that the employer's stated justification for its adverse action was nothing but a pretext for discrimination . . . [or] by adducing evidence that, even if the employer had mixed motives, the plaintiff's membership in a protected class was at least one motivating factor in the employer's adverse action"), *petition for cert. filed*, No. 23-1346 (June 26, 2024).

      **B.**    **Discrete Act Discrimination**

             1.    <u>Failure to Promote</u>

      Plaintiff identifies four positions to which she was not promoted in 2017: (1) Director, Production Planning, SMS; (2) Superintendent, Transportation, Buses; (3) Office Manager, President's Office; and (4) Special Assistant, President's Office.  (Def.'s 56.1 ¶¶ 59, 69, 72, 74.) While timely, Plaintiff's claims as to these positions fail on the merits.

"It is well-established that a failure to promote is an adverse employment action." *Levitant v. City of N.Y. Hum. Res. Admin.*, 558 F. App'x 26 (2d Cir. 2014) (summary order) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)). To establish a prima facie failure-to-promote case, a plaintiff must show that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73 (2d Cir. 2009) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004)). "[F]or the plaintiff to avoid an adverse judgment, there must be proof that the plaintiff 'was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998)).

Here, Plaintiff fails to establish a prima facie case as to the Director, Production Planning position because it is undisputed that she did not have the requisite qualifications. "Eligibility requirements are defined by the employer, and a plaintiff's subjective belief that she is qualified for the position is not sufficient." *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 267–68 (E.D.N.Y. 2013) (citing, *inter alia*, *Aulicino*, 580 F.3d at 81 (analyzing whether plaintiff was qualified for the position based on the qualifications listed in the job posting)). As stated in the job description, the Direction, Production Planning position required "[a] bachelor's degree in business, engineering or management science," as well as "[s]ix years of experience in a rapid transit or related industry, three years of which must have been in a supervisory/managerial capacity." (Dkt. 107-2.) It is beyond dispute that Plaintiff had neither the educational background nor the management experience specified in the posting. (Def.'s 56.1 ¶¶ 61–63.) Accordingly, Plaintiff has not "demonstrate[d] that she possessed the basic skills necessary for performance of

31

the job." *See Ellis*, 975 F. Supp. 2d at 267–28 (internal quotation marks omitted); *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 131 (E.D.N.Y. 2012) (dismissing failure-to-promote claim where plaintiff failed to establish that he was qualified for the positions he sought, and explaining that "being qualified refers to the criteria the employer has specified for the positions" (internal quotation marks omitted)).

Even assuming Plaintiff could establish that she was qualified to be Director, Production Planning, her claims based on that position would fail for other reasons. Defendant has offered "legitimate, non-discriminatory reasons" for its decision to promote Trinchese instead of Plaintiff. *Flowers v. Conn. Light & Power Co.*, 774 F. App'x 33, 36 (2d Cir. 2019) (summary order) (quoting *McDonnell Douglas*, 411 U.S. at 802). Namely, Trinchese had certain desired qualifications— including a degree in business management and several years of management experience— whereas Plaintiff did not. *Flowers*, 774 F. App'x at 35–36 (explaining that the court "must respect an employer's unfettered discretion to choose among qualified candidates" (quoting *Sassaman v. Gamache*, 566 F.3d 307, 314 (2d Cir. 2009))). For her part, Plaintiff has failed to offer adequate evidence of pretext, or even identify who made the hiring decision.[18]  (Def.'s 56.1 ¶ 64.)  *Cf.*

---

[18] Plaintiff points to Balkaran's "angry Black woman" comment as showing pretext, (*see* Pl.'s Mem. at 11), but offers no evidence that Balkaran, who became Plaintiff's supervisor in 2019, was involved in the 2017 promotion decision at issue. *See Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 458 (S.D.N.Y. 2023) (concluding that "generalized comments" that were not made temporally near any of Plaintiff's promotion requests nor by individuals involved in the promotion decisions were not probative of discrimination). Plaintiff's attempt to use two other facts—her assignment to McClean, a Black supervisor, which occurred in 2014, and Angerami taking away the parking spot at some unspecified point in time—as evidence of discriminatory intent or pretext is also unpersuasive. (*See* Pl.'s Mem. at 11.) The first incident is not close enough in time to the promotion decisions that Plaintiff challenges, and Plaintiff is unable to convincingly connect either incident to the individuals who made the promotion decisions with which she takes issue. Additionally, Plaintiff's testimony that no women of color had been promoted into managerial positions within the PPS Group during her tenure is too conclusory to create a genuine issue of material fact. *See Weinstock*, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact."); *cf. Taylor*, 207 F. Supp. 3d at 305 (finding, *inter alia*,

*Tolbert v. Smith*, 790 F.3d 427, 437–38 (2d Cir. 2015) (finding plaintiff established prima facie failure to promote case where "de facto decisionmaker" made discriminatory remarks about plaintiff's qualifications).

As to the three other positions—Superintendent, Transportation; Special Assistant, President's Office; and Officer Manager, President's Office—Plaintiff herself acknowledged that she did not think that her gender or race factored into her non-selection for these positions.  (*See* Knight Dep. Tr. at 74:5-76:3, 76:10–77:6.)  To the contrary, Plaintiff indicated that she likely was not qualified for at least the Superintendent, Transportation, Buses position.  (*See id.* at 74:5–9 ("Q. Do you believe that you were not selected for an interview [for the Superintendent, Transportation, Buses position] because of your race? A. No, not in this instance, I don't, because I don't know the department of buses, I've never worked for the department of buses.").)  Based on Plaintiff's own testimony, no reasonable jury could find that Plaintiff was not promoted to these three positions under circumstances giving rise to an inference of unlawful discrimination.  *See Sanders-Peay v. N.Y.C. Dep't of Educ.*, No. 20-CV-1115 (PKC) (VMS), 2024 WL 3937597, at *9 (E.D.N.Y. Aug. 26, 2024) (granting summary judgment to employer on plaintiff's age-based failure-to-hire claim because plaintiff admitted that the failure to hire her was not based on her age).

Finally, Plaintiff's failure-to-promote claims fail as a matter of law to the extent that they are premised on positions for which she did not apply.  Failure to promote claims "generally [] require a plaintiff to allege that she or he applied for a specific position or positions and was

---

*evidence* that only two of 370 individuals in the desired position were members of plaintiff's protected class was probative of discriminatory intent).  Finally, the fact that "other employees who are not Black women" *were* promoted is not probative without competent evidence regarding those employees' qualifications and the requirements for the jobs to which they were promoted. (*See* Def.'s Reply 56.1 ¶ 48; Pl.'s Mem. at 6.)

rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Brown*, 163 F.3d at 710; *see Workneh*, 897 F. Supp. 2d at 131 (dismissing failure to promote claims where plaintiff admitted he never applied to the positions at issue and instead merely alleged that he was not promoted while other employees were); *Tulino v. City of New York*, No. 15-CV-7106 (JMF), 2016 WL 2967847, at *6 (S.D.N.Y. May 19, 2016) ("That Plaintiff expressed a general interest in promotion, however, is not enough to excuse her from the specific-application requirement; indeed, one of the key purposes of that requirement is to protect employers from the unfair burden of having to keep track of all employees who have generally expressed an interest in promotion and [to] consider each of them for any opening for which they are qualified but did not specifically apply." (internal quotation marks omitted)).  While there is a "narrow" exception to the specific-application requirement where "the vacancy at issue was not posted, and [] the employee either had [] no knowledge of the vacancy before it was filled or [] attempted to apply for it through informal procedures endorsed by the employer," *Tulino*, 2016 WL 2967847, at *5, Plaintiff adduces no evidence indicating that any of these conditions existed here.

* * *

For the reasons stated above, Plaintiff's Title VII and NYSHRL failure-to-promote claims are dismissed with prejudice.

### 2.    Pay Discrimination

"Subjecting an employee to unequal pay can, of course, constitute a materially adverse employment action."  *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 118 (S.D.N.Y. 2020) (internal quotation marks omitted).  Here, Plaintiff contends that she experienced pay discrimination with regard to her base salary and with regard to overtime pay, both because she

was denied overtime opportunities and because Defendant failed to pay her for her overtime.  (*See* Knight's Dep. Tr., Dkt. 109-61, at 145:20-146:15, 147:8-19, 154:7–22.)  The Court considers each theory of liability in turn.

a.     Plaintiff's Base Salary

Plaintiff's claims as to her base salary fail because she has not presented sufficient evidence that she was paid less than similarly situated NYCTA employees or that she was otherwise discriminatorily underpaid.  In her Third Amended Complaint, Plaintiff alleges that it is NYCTA's "practice . . . to assign[] base salaries at the lowest end of the pay scale to African American women while assigning non-African American and male employees' salaries at the higher end of the available pay scale."  (TAC, Dkt. 71, ¶ 31.)  As such, Plaintiff claims that she "has remained at the lowest end of the pay scale for her position since 1999 in each and every title she has held." (*Id.* ¶ 32.)  In support of these allegations, Plaintiff offers only her own deposition testimony regarding her belief that her salary was "inferior," and that "African Americans . . . remain at the [] bottom of the salary range for their entire tenure, where [W]hite employees are hired mid range or towards the top of the range."  (Knight Dep. Tr. at 101:14–19, 104:2–9.)

However, Plaintiff's assertions of pay discrimination are not supported by the record.  *See Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 582–83 (S.D.N.Y. 2013) (plaintiff's testimony that she "began to suspect that she was being underpaid as a result of her gender after she started to learn about what other people were making, and *some* of them were men" was insufficient to establish a prima facie case where plaintiff "fail[ed] to identify who these other people were [and] what their duties were" (internal quotation marks omitted)).  Plaintiff does not, for example, point to compensation records showing she was generally underpaid or paid less than non-African American and male employees, nor does she point to a specific comparator who held

a comparable position but was paid more than her.  *Cf. Lenzi v. Systemax, Inc.*, 944 F.3d 97, 111 (2d Cir. 2019) (finding plaintiff made a prima facie showing of pay discrimination by, *inter alia*, introducing evidence demonstrating that employer paid plaintiff "at a rate that was below market for her position," but "paid nearly all of [plaintiff's] male executive peers above market rate for their respective positions"); *Boatright v. U.S. Bancorp*, No. 18-CV-7293 (LJL), 2020 WL 7388661, at *16 (S.D.N.Y. Dec. 16, 2020) (finding plaintiff had established she was underpaid by identifying a male comparator who held comparable positions to her but was paid substantially more at all relevant times), *aff'd*, No. 20-4236, 2022 WL 351059 (2d Cir. Feb. 7, 2022).  In short, Plaintiff's conclusory assertions are not enough to create a genuine issue of material fact and overcome Defendant's motion for summary judgment.  *See Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 572 (S.D.N.Y. 2012) ("A plaintiff cannot establish a *prima facie* case based on 'purely conclusory allegations of discrimination, absent any concrete particulars.'" (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985))), *aff'd*, 526 F. App'x 124 (2d Cir. 2013) (summary order); *see also Russell v. County of Nassau*, 696 F. Supp. 2d 213, 232 (E.D.N.Y. 2010) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

By contrast, Defendant has presented evidence indicating that Plaintiff's salary was set in accordance with NYCTA's policies.  Initially, Plaintiff "held a union-represented position and was paid in accordance with the applicable union contract"; Plaintiff's supervisors had no discretion over Plaintiff's salary during that period.  (Def.'s 56.1 ¶ 98; Franceschini Dep. Tr., Dkt. 106-3, at 81:14–16.)  When an individual is promoted at NYCTA, that individual is paid within a minimum salary range for that position or a 10% increase, whichever is greater, and there is no discretion to pay more.  (Def.'s 56.1 ¶¶ 101, 103.)  Consistent with this policy, when Plaintiff was promoted in

1995, 1997, and 1999, Plaintiff was paid the minimum salary for those respective positions.  (*Id.* ¶¶ 99–102; Dkt. 109-5 at ECF 3–4 (showing greater than 10% increase).)  Finally, Defendant produced documentary evidence showing that Plaintiff received 23 GWIs throughout her employment at NYCTA.  (Def.'s 56.1 ¶ 105; *see also* Dkt. 109-5.)  As noted *supra*, a GWI is a predetermined, percentage-based salary increase that is given to all employees; there is no discretion to award an employee more than the predetermined amount.[19]  (Def.'s 56.1 ¶ 104.) Other than pure speculation, Plaintiff does not offer any evidence indicating that other employees were compensated outside of NYCTA's policy guidelines.  *See Lee v. Healthfirst, Inc.*, No. 04-CV-8787 (THK), 2007 WL 634445, at *12–14 (S.D.N.Y. Mar. 1, 2007) (granting summary judgment where evidence demonstrated defendant based salary increases and bonuses on guidelines, and plaintiff presented no evidence showing that other employees received raises outside of the guidelines, and instead merely alleged that she received no raise on her base salary while "others" did); *Frederick v. United Bhd. of Carpenters & Joiners of Am. (UBCJA) Loc. 926*,

---

[19] Plaintiff argues that her salary history indicates that there was one instance, in September 2014, when she did not receive a GWI to which she was entitled.  (Pl.'s Mem. at 13–14; *see also* Def.'s 56.1 ¶¶ 104–05 ("Plaintiff's Job Detail Summary shows . . . she did not receive a pay increase from 2013[.]"); Dkt. 109-5 at ECF 3 (Plaintiff's salary history showing no increase between 1/1/2023 and 9/20/2014).)  Jennifer Franceschini, Deputy Chief of Talent Acquisition at NYCTA, testified that this may have been due to a technological error in generating the job detail rows, as opposed to an actual pay discrepancy.  (Franceschini Dep. Tr., Dkt. 109-66, at 4:14–18, 92:10–94:2.)  Additionally, it is undisputed that Plaintiff received a GWI in January 2013 and December 2014.  (Dkt. 109-5 at ECF 2–3.)  Drawing all inferences in favor of Plaintiff, the non-moving party, the purported discrepancy in September 2014 could be sufficient to create a disputed issue of material fact as to whether Plaintiff experienced an adverse employment action related to her compensation.  However, any claim premised on such a discrepancy would be time-barred. *See supra* Discussion § I (discussing statute of limitations for Plaintiff's Title VII, NYSHRL, and NYCHRL claims); *Richard*, 2022 WL 4280561, at *27 (dismissing disparate pay claim where plaintiff could not "establish that he was paid less than similarly situated non-members of his protected class during the relevant period" within the statute of limitations); *see also Russell*, 696 F. Supp. 2d at 235 ("[T]he mere fact that [p]laintiff did not receive the [cost of living increase to which he was entitled] in and of itself does not permit an inference that the reason was his race.").

No. 12-CV-2387 (BMC), 2015 WL 12964662, at *3 (E.D.N.Y. Mar. 26, 2015) (granting summary judgment where defendant showed "a rational, consistent salary policy that has been applied uniformly to employees both in and out of the protected class"), *aff'd sub nom. Frederick v. United Bhd. of Carpenters*, 665 F. App'x 31 (2d Cir. 2016) (summary order).

### b.   Denial of Overtime

Plaintiff's claims regarding overtime fall into two categories.  First, Plaintiff contends that she was denied overtime opportunities. (*See* Pl.'s Mem. at 13–14.)  This claim fails for similar reasons as Plaintiff's claim regarding her base salary.  Although Plaintiff broadly asserts that she was not authorized to work the same amount of overtime as other employees, she offers no competent evidence documenting the amount of overtime that those employees actually worked. (*See* Def.'s 56.1 ¶¶ 136–38.)  At her deposition, Plaintiff identified two employees whom she claimed were authorized to work more overtime, but Plaintiff conceded that she lacked personal knowledge about how many overtime hours those employees worked during the relevant time period and the payments they received.  (Knight Dep. Tr. at 151:6–23, 157:2–10.)  Moreover, neither employee reported to the same supervisors as Plaintiff.  (*Id.* at 157:11–19.)  "Such bare allegations are insufficient to establish an adverse employment action."  *Bowen-Hooks*, 13 F. Supp. 3d at 217–18 (finding plaintiff "ha[d] not shown she was denied overtime" where plaintiff claimed that other staff members who were junior to her received overtime assignments, but could not provide any specific examples and there was no other evidence in the record to support such a claim); *see also Hayle v. Nassau Health Care Corp.*, No. 08-CV-2396 (DRH) (GRB), 2013 WL 6231164, at *6 (E.D.N.Y. Dec. 2, 2013) ("Plaintiff's complaint that she was not able to get as much overtime as the other supervisors in her department is also deficient because it is comprised only of her own conclusory testimony."); *Villar*, 135 F. Supp. 3d at 128 (granting summary

38

judgment on Title VII denial of overtime claim because "[a]lthough the record indicates that [p]laintiff's overtime earnings decreased . . . it [did] not contain evidence of what other [comparable employees] earned in overtime [during the same period]").

Second, Plaintiff contends that she was not paid for overtime that she worked. (*See* Pl.'s Mem. at 13–14 (stating that "[Plaintiff]'s unpaid overtime hours are 'over 60 hours'" (quoting Knight Dep. Tr. at 147:3–7)).) In response, Defendant argues that "[t]he undisputed facts establish that Plaintiff was paid for the days she worked overtime as a test monitor in 2017 and 2019." (Def.'s Reply in Supp. of Summ. J. ("Def.'s Reply"), Dkt. 112, at 4 (citing Def.'s 56.1 ¶¶ 129–30).) While the Court agrees that Plaintiff's deposition testimony on this point is contradictory at best, (*see* Knight Dep. Tr. at 144:17–24 (Plaintiff testifying that she had overtime that had not been paid), 150:6–9 (Plaintiff testifying that she was ultimately paid for overtime that she worked after she filed a complaint)), at this stage, the Court is obligated to draw all reasonable inferences in favor of Plaintiff, the nonmoving party, *see Holcomb*, 521 F.3d at 132. Thus, the Court finds that Plaintiff has at least demonstrated a genuine issue of material fact as to whether she suffered an adverse employment action for the purposes of establishing a prima facie case of discrimination. *See Sethi v. Narod*, 12 F. Supp. 3d 505, 528 (E.D.N.Y. 2014) (assuming that plaintiff's alleged denial of overtime pay was an adverse employment action).

Nevertheless, Defendant is entitled to summary judgment because Plaintiff has not established that the circumstances of this adverse employment action give rise to an inference of discrimination. "An inference of discrimination can be drawn from circumstances such as 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse

employment action].'" *Sethi*, 12 F. Supp. 3d at 528 (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)) (collecting cases).  "However, a plaintiff's mere subjective belief that [she] was discriminated against does not sustain a discrimination claim."  *Id.* (cleaned up).  As noted above, Plaintiff has not presented any competent evidence that she was treated less favorably than similarly situated employees outside of Plaintiff's protected groups.  (*See* Knight Dep. Tr. at 151:6–23, 157:2–10 (Plaintiff testifying that she lacked personal knowledge regarding the payments her purported comparators received and acknowledging that those comparators reported to different supervisors than she did).)  And while the Court agrees with Plaintiff that assigning all Black employees to a Black supervisor *could* give rise to an inference of discrimination, (Pl.'s Mem. at 12), here, the circumstances are too attenuated.  First, the assignment to McClean occurred in 2014, (*see* Knight Dep. Tr. at 39:23–40:1 (Plaintiff testifying that she began reporting to McClean "around 2014, probably mid year")), whereas the alleged instances of unpaid overtime occurred in 2017 and 2019, (*see* TAC, Dkt. 71, ¶¶ 41–44, 54).  Second, Plaintiff herself attributes the potentially discriminatory decisions to different actors, alleging that Rodgers was responsible for assigning her to McClean, (*see* Knight Dep. Tr. at 106:1–24), and that Angerami and Balkaran were responsible for denying her overtime payments, (*id.* at 146:7–9 ("Q. Who do you contend discriminated against you with respect to overtime because of your race? A. Mr. Angerami."); TAC, Dkt. 71, ¶ 54 (alleging that "Balkaran refused to process overtime payment" in 2019)).

Again, Plaintiff argues that Balkaran's "angry Black woman" comment raises an inference of discrimination sufficient to sustain a prima facie case.  (Pl.'s Mem. at 11.)  While this comment was inappropriate, it does not give rise to an inference of discrimination with regard to Plaintiff's pay-discrimination claims.  First, the remark was made nearly one year after the alleged 2019 denial of overtime (and several years after the 2017 denial of overtime).  *See Sethi*, 12 F. Supp. 3d

at 540–41 (noting that "[d]istrict courts in this Circuit have found that a three-month lapse between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination") (collecting cases); *see also Onitiri v. Seal Sec.*, No. 12-CV-5425 (PKC), 2015 WL 13019584, at *5 (E.D.N.Y. Feb. 5, 2015) (concluding that "[t]he lapse in time between the alleged comments and the adverse action [was] too great to infer a discriminatory motive," where the adverse action was approximately two to three years after the first alleged comment and one year after the second alleged remark (internal quotation marks omitted)), *aff'd sub nom. Onitiri v. Seal Sec.*, 633 F. App'x 15 (2d Cir. 2016) (summary order).  Second, Plaintiff has not presented any evidence that Balkaran's remark was related to the alleged pay-discrimination actions.  *See Johnson v. County of Nassau*, 480 F. Supp. 2d 581, 599 (E.D.N.Y. 2007) ("In order for the remarks to be deemed significant, the plaintiff must show their nexus to the adverse employment decision."); *Sethi*, 12 F. Supp. 3d at 542–43 (noting "[w]here remarks are unrelated to a decision taken with respect to a plaintiff, they are not probative of discriminatory intent") (collecting cases).  This stray remark, without more, does not constitute sufficient evidence to establish an inference of discrimination.  *Sethi*, 12 F. Supp. 3d at 544 (concluding that comments made by decisionmaker—"You f—king Indian . . . . I will make sure you are sent back to India"— were stray remarks as they were unrelated to the adverse employment action at issue and therefore did not constitute sufficient evidence to establish an inference of discrimination); *see also Maqsood v. Bell Sec., Inc.*, 249 F. App'x. 229, 230 (2d Cir. 2007) (summary order) ("Here, certain comments were allegedly made by [defendant's] employees approximately two years before [plaintiff's] termination, and were thus 'remote' from any adverse employment action. Moreover, such comments were isolated, ambiguous, and insufficient to support a finding of discrimination based on national origin or religion.").

41

* * *

Plaintiff's Title VII and NYSHRL pay discrimination claims are dismissed with prejudice.

      3.    <u>Other Adverse Employment Actions</u>

In addition to the failure-to-promote and pay-discrimination claims discussed above, Plaintiff contends that she "sustained several [other] adverse employment actions," such as being "falsely marked AWOL while out sick" in 2018, 2019, and 2021,[20] and being "wrongfully brought on charges."[21] (Pl.'s Mem. at 15.) An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir.2004) (internal quotation marks omitted). Examples "include termination, demotion, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Littlejohn v. City of New York*, 795 F.3d 297, 312 n.10 (2d Cir. 2015) (internal quotation marks and citation omitted). "A negative evaluation or official reprimand 'may, in some circumstances, constitute adverse employment action,' but only when it 'trigger[s] negative consequences to the conditions of employment.'" *Brown v. City of New York*, No. 14-CV-2668 (PAE), 2014 WL 5394962, at *8 (S.D.N.Y. Oct. 23, 2014) (first quoting *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (summary order); then quoting *Taylor v. N.Y.C.*

---

[20] Although Plaintiff failed to submit medical documentation for her October 2020 absence, the record does not indicate that she was marked AWOL during that time. However, even if Plaintiff had been marked AWOL during her sick leave in October 2020, it would not give rise to an adverse employment action because Plaintiff was paid for that time. *See supra* Background § I.I.

[21] Plaintiff's argument that she was compelled to retire early because of the daily discrimination, harassment, unequal pay, and retaliation is discussed in the context of her hostile work environment, retaliation, and constructive discharge claims. *See infra* Discussion §§ I.C, I.D, I.E.

*Dep't of Educ.*, No. 11-CV-3582 (JG), 2012 WL 5989874, at *7 (E.D.N.Y. Nov. 30, 2012)), *aff'd*, 622 F. App'x 19 (2d Cir. 2015) (summary order).

Based on the record before the Court, no reasonable jury could find that Plaintiff experienced an adverse employment action when she was marked AWOL in 2018 and 2019 and/or subjected to OATH charges.  Plaintiff presents no evidence that these actions gave rise to material adverse changes in her working conditions or other negative consequences.  *See Brooks v. Doe Fund, Inc.*, No. 17-CV-3626 (PKC) (LB), 2020 WL 13659079, at *9 (E.D.N.Y. Mar. 31, 2020) (finding that plaintiff who was given undeserved write-ups did not experience adverse employment action because there were no material adverse changes to working conditions).  There is no indication that the OATH charges were ever adjudicated, and Plaintiff continued to work at NYCTA in the same role until her retirement.  *See Merisier v. Kings Cnty. Hosp.*, No. 15-CV-2739 (RRM) (RML), 2020 WL 13666419, at *6 (E.D.N.Y. Sept. 29, 2020) (finding plaintiff "failed to show that OATH proceedings constituted an adverse employment action" where charges were never adjudicated and plaintiff continued to work in the same role during the pendency of proceedings, and thus "never experienced a resulting change in the terms and conditions of her employment"); *see also id.* (rejecting plaintiff's argument that having to "use personal or vacation days in order to attend meetings relating to the OATH proceedings" constituted an adverse employment action); *Brown*, 2014 WL 5394962, at *8 (finding plaintiff failed to allege OATH court summons amounted to adverse employment action where plaintiff did not allege that the "summons led to any further consequences, let alone ones that altered the conditions of her employment").

Likewise, requiring Plaintiff to provide medical documentation for her sick leave in 2018 and 2019, and placing Plaintiff on AWOL status when she failed to provide such documentation,

also does not rise to an adverse employment action.  *See Pierre v. Napolitano*, 958 F. Supp. 2d 461, 479–80 (S.D.N.Y. 2013) ("Requiring an employee to provide medical documentation is not a materially adverse action. . . . Moreover, because [employer's] request for medical documentation was not an adverse employment action, the placement of plaintiff on AWOL status, which was the direct result of his failure to provide such documentation, was also not an adverse employment action." (cleaned up)); *see also Blake v. Potter*, No. 03-CV-7733 (LAP), 2007 WL 2815637, at *6 (S.D.N.Y. Sept. 25, 2007) ("[C]ourts in this District have held that an employer's request for documentation in connection with medical leave does not constitute such an 'adverse employment action.'" (citing, *inter alia*, *Henriquez v. Times Herald Rec.*, No. 97-CV-6176 (SHS), 1997 WL 732444, at *6 (S.D.N.Y. Nov. 25, 1997)), *aff'd*, 330 F. App'x 232 (2d Cir. 2009) (summary order).  Notably, Plaintiff was ultimately paid for the disputed sick time in 2018 and 2019.  (Knight Dep. Tr. at 135:17–136:4, 143:21–23); *see Jordan v. Potter*, No. 05-CV-3005 (SJF) (ETB), 2008 WL 11435760, at *11 (E.D.N.Y. May 20, 2008) ("The wrongful reporting of plaintiff as AWOL, which was adjusted approximately one (1) month later, and for which there was no evidence of injury or harm to plaintiff, does not constitute a materially adverse employment action."); *cf. Krishnapillai v. Donahoe*, No. 09-CV-1022 (NGG) (SMG), 2013 WL 5423724, at *12–13 (E.D.N.Y. Sept. 26, 2013) (finding that a plaintiff who was denied the use of paid sick time sufficiently established an adverse employment action).

By contrast, the Court finds that Plaintiff being marked AWOL in January 2021—based on Plaintiff's absence from work between December 31, 2020, and January 27, 2021—could give rise to an adverse employment action because she was not paid for that time.  *See Krishnapillai*, 2013 WL 5423724, at *12–13.  Moreover, Balkaran's "angry Black woman" comment, which Plaintiff testified was made at some point between September and November of 2020, (*see* Knight

Dep. Tr. at 221:2–8), is arguably close enough in time to give rise to an inference of discrimination. *See Bart*, 96 F.4th at 576 (finding that sexist remarks made as recently as two months before an adverse employment action gave rise to an inference of discrimination). Thus, the Court finds that Plaintiff has established a prima facie case of discrimination as to the January 2021 AWOL period, albeit just barely.

However, Plaintiff's claim fails on the second and third stages of the *McDonnell Douglas* analysis. First, the Court finds that Defendant has articulated a "legitimate, nondiscriminatory reason for the adverse employment action." *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013)). Specifically, Defendant has shown that Plaintiff did not comply with NYCTA's policies for taking sick leave. Indeed, Plaintiff did not communicate at all with her supervisors during her over three-week absence between January 4 and January 27, 2021, despite being instructed on December 30, 2020, that she would have to report in-person to the Coney Island office until her claimed laptop issues were resolved. (Dkt. 107-24; *see* Def.'s 56.1 ¶ 244 ("[Plaintiff] did not have any communication with anyone at [NYCTA] between December 31, 2020, and January 27, 2021, and, during that time, had left her work-issued laptop in a drawer in her desk at her office.").)[22]  *See Livingston v. City of New York*, 563 F. Supp. 3d 201, 239–40 (S.D.N.Y. 2021) (finding defendants provided legitimate, nondiscriminatory reasons for marking plaintiff AWOL because plaintiff "had not followed established procedures for requesting an

---

[22] Plaintiff testified that she informed her supervisors that she was sick at some point, but does not specify when, (Knight Dep. Tr. at 358:1–23), and on January 4, 2021, Plaintiff's daughter also emailed Balkaran stating that Plaintiff was sick, (Dkt. 109-59). However, there is no other evidence that Plaintiff communicated with her supervisors during this time or otherwise complied with NYCTA's sick leave policy. (*See* Dkt. 107-31 at ECF 3 (sick leave policy noting that an employee must notify NYCTA at least one hour prior to the employee's "tour of duty" and must include the "anticipated duration of the absence").)

accommodation . . . at the time of his absences"); *Winkfield v. City of New York*, No. 97-CV-2183 (HB), 1999 WL 1191544, at *5 (S.D.N.Y. Dec. 15, 1999) (finding defendant-employer offered evidence of a legitimate, nondiscriminatory reason for withholding plaintiff's pay where plaintiff failed to respond to defendant-employer's "legitimate demand that plaintiff provide written documentation to validate his AWOL status").

Second, Plaintiff has failed to adduce sufficient evidence showing that Defendant's stated explanation for marking Plaintiff AWOL was merely a pretext for discrimination *or* that Defendant was motivated at least in part by discriminatory motives. *See Bart*, 96 F.4th at 567. Although Plaintiff's brief does not directly address her third stage *McDonnell Douglas* burden, (*see* Pl.'s Mem.), the Court assumes she would cite to the same evidence that she relies on to establish an inference of discrimination—namely, Balkaran's "angry Black woman" comment. "But while that may be enough to satisfy [] [P]laintiff's initial burden to establish a *prima facie* case," it is "insufficient to overcome" Defendant's legitimate, nondiscriminatory reason for marking Plaintiff AWOL, when she failed to appear for work or communicate with NYCTA for almost four weeks. *Carter v. TD Bank, N.A.*, No. 23-950, 2024 WL 2828470, at *3 (2d Cir. June 4, 2024); s*ee also Azam v. Yale Univ.*, No. 18-CV-1260 (AWT), 2020 WL 5803222, at *10 (D. Conn. Sept. 29, 2020) (explaining "[i]f the plaintiff's evidence was barely sufficient to make out a *prima facie* case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale" (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997))). Unlike in *Bart*, where the employer repeatedly made gender-based remarks about the plaintiff's ability to do her job,[23] here, Balkaran made a single comment that was not explicitly related to

---

[23] For example, the employer remarked that "he didn't think women should be managers," that "being a manger was 'too stressful' for women," and that "women were 'too sensitive to be managers.'" *Bart*, 96 F.4th at 568.

Plaintiff's job performance or qualifications.  *Cf. Bart*, 96 F. 4th at 568 ("[The plaintiff] testified

that [her employer] made several remarks to her, including close in time to the firing, insinuating

that he believed that a man would perform better in [plaintiff's] role than a woman would."); *id.*

(finding that employer's remarks were "sufficient to support a finding of discriminatory motive"

because "the comments alleged were (1) made repeatedly, (2) drew a direct link between gender

stereotypes and the conclusion that [plaintiff] is ill-suited for her position as a manager, and (3)

were made by a supervisor who played a substantial role in the decision to terminate [plaintiff]"

(cleaned up)).   Nor has Plaintiff "identified weaknesses, implausibilities, inconsistencies, or

contradictions in [Defendant's] proffered legitimate, nonretaliatory reasons for its action" from

which "a reasonable juror could conclude that the explanations were a pretext for a prohibited

reason."  *Cf. Gordon-Mallett v. Mount Sinai Hosps. Grp., Inc.*, No. 22-CV-1159 (LJL), 2024

WL 1513910, at *12 (S.D.N.Y. Apr. 8, 2024) (internal quotation marks omitted) (denying

summary judgment where defendant's nondiscriminatory reason was vague and contrary to prior

stated goals).

Accordingly, the Court grants summary judgment to Defendant on Plaintiff's Title VII and

NYSHRL claims premised on the alleged adverse employment actions discussed above.[24]

## C.    Hostile Work Environment

"To establish a prima facie case of hostile work environment" under Title VII and the

NYSHRL, a "plaintiff must show that the discriminatory harassment was 'sufficiently severe or

---

[24] The Court considers only the alleged adverse employment actions that Plaintiff explicitly raises in her brief as it is not the Court's role "to scour the record . . . and serve generally as an advocate" for Plaintiff.  *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002); *see also Lipton v. County of Orange*, 315 F. Supp. 2d 434, 439 n.3 (S.D.N.Y. 2004) (explaining that when a plaintiff fails to connect legal principles "to properly cited facts," it is not the court's "responsibility, . . . to form plaintiff's arguments for [them] by researching the record and relevant case law").

pervasive to alter the conditions of [her] employment and create an abusive working environment,' and 'that a specific basis exists for imputing' the objectionable conduct to the employer.'" *Tolbert*, 790 F.3d at 439 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "It is axiomatic that the plaintiff also must show that [the] hostile conduct occurred because of a protected characteristic." *Eka v. Brookdale Hosp. Med. Ctr.*, 247 F. Supp. 3d 250, 276 (E.D.N.Y. 2017) (internal quotation marks omitted); *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 240 (E.D.N.Y. 2015) ("While a plaintiff need not present direct evidence that she suffered a hostile work environment on the basis of her protected characteristics, she must at least set forth circumstantial or other indirect evidence to allow the Court to conclude that [] any facially-neutral incidents were, in fact, discriminatory."). When determining whether the plaintiff has met her burden to show that the conduct at issue was "sufficiently severe or pervasive," the court "examin[es] the totality of the circumstances, including[] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (citations omitted) (third alteration in original). The incidents at issue must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Das v. Consolidated School Dist. of New Britain*, 369 F. App'x 186, 190 (2d Cir. 2010) (summary order) (internal quotation marks omitted).

Plaintiff bases her hostile work environment claims on the following facts: (1) "[Plaintiff's] inability to advance in her career for the last 22 years"; (2) "how Black women were kept at the bottom of the salary range"; (3) the denial of opportunities to work overtime; (4) "the culture of discrimination that she was working in for decades"; (5) Balkaran's "angry Black woman"

comment; (6) the revocation of Plaintiff's telecommuting privileges at the end of December 2020;

(7) being locked out of her office prior to her retirement; and (8) "the psychological harm and

health complications that were caused by the frequent and ongoing harassment and

discrimination[.]"  (Pl.'s Mem. at 18.)[25]  As an initial matter, the first three bases that Plaintiff

identifies fail for the same reasons discussed in the context of Plaintiff's failure-to-promote and

pay-discrimination claims.  *See supra* Discussion §§ II.B.1–2.  Likewise, Plaintiff's allegations

---

[25] The Third Amended Complaint identifies several other bases for Plaintiff's hostile work environment claim, including the transfer of certain of Plaintiff's job responsibilities to a White man, Halvax's and Angerami's reluctance to interact with Plaintiff, McClean's request that Plaintiff file a work-related injury report in connection with Plaintiff's January 2018 sick time, an incident in April 2019 where McClean yelled at her, and Plaintiff being marked AWOL in October 2019.  (TAC, Dkt. 71, ¶¶ 38–40, 49, 51–53.)  Defendant argues that Plaintiff cannot establish that any of the aforementioned "incidents were infected by discriminatory animus."  (Def.'s Mem. of Law in Supp. of Summ. J. Mot. ("Def.'s Mot."), Dkt 104, at 10–15.)  Plaintiff's brief does not respond to this argument or otherwise reference these incidents in the context of her hostile work environment claim.  (*See* Pl.'s Mem. at 17–20.)  Accordingly, the Court deems these theories of liability abandoned.  *See Sanders-Peay*, 2024 WL 3937597, at *8–10; *see also, e.g.*, *Benoit v. Metro. Transp. Auth.*, No. 15-CV-6095 (JFK), 2016 WL 6902190, at *11 (S.D.N.Y. Nov. 21, 2016) (finding that plaintiff abandoned theories of liability by failing to address them in her opposition to summary judgment).

Defendant also argues that Plaintiff's hostile work environment claims are time-barred to the extent that they are based on conduct that took place outside the applicable statute of limitations period.  (*See* Def.'s Mot. at 11 n.6); *supra* at Discussion § I (discussing timeliness).  Because Plaintiff does not address this argument in her opposition brief, Defendant contends that Plaintiff has "waived any argument that her claims are timely."  (*See* Def.'s Reply at 5 (citing *Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (summary order)).)  Although different standards of timeliness apply to hostile work environment claims than claims premised on discrete acts, the Court need not address this point because Plaintiff's opposition brief does not identify any conduct that occurred outside the statutory period as forming the basis of Plaintiff's hostile work environment claim.  *See Husser v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 253, 263 n.3, 265 (E.D.N.Y. 2015) ("[A] hostile work environment claim by its very nature involves repeated conduct over time rather than a discrete occurrence on a particular day.  It is therefore timely if at least one act contributing to the claim occurred within the limitations period." (citations omitted)); *see also Sylla v. N.Y.C. Dep't of Educ.*, 664 F. Supp. 3d 311, 324 (E.D.N.Y. 2023) (explaining that "untimely acts must be 'part of the same actionable hostile work environment practice' as the timely act" to be considered timely (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010))).

concerning "the culture of discrimination" at NYCTA and the "psychological harm and health complications" that she experienced are too vague and conclusory to create a disputed issue of material fact.  (Pl.'s Mem. at 18); *see Kaur v. N.Y.C. Health & Hosps. Corp.*, No. 07-CV-6175 (LAP), 2010 WL 11589961, at *2–3 (S.D.N.Y. May 10, 2010) (plaintiff's testimony "that she endured a hostile work environment on a daily basis" was too vague and conclusory to defeat defendant-employer's motion for summary judgment (cleaned up)); *Equal Emp. Opportunity Comm'n v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 849 (S.D.N.Y. 2013) (plaintiff's statement that she suffered significant psychological harm as a result of defendant's discriminatory and retaliatory actions was too vague and conclusory to sustain hostile work environment claim); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (explaining that "even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment").

The remaining conduct that Plaintiff identifies—Balkaran's comment, the revocation of Plaintiff's telecommuting privileges, and Plaintiff being locked out of her office in January 2021 when she came back from leave—is neither sufficiently pervasive nor severe, whether taken individually or as a whole, to sustain Plaintiff's hostile work environment claim.  *See Sanders-Peay*, 2024 WL 3937597, at *17 (holding that two discriminatory comments and "obstinate and insensitive responses to a plaintiff's repeated requests for accommodation" did not "rise to the level of a hostile work environment" (internal quotation marks omitted)).  Furthermore, there is no basis to conclude that the conduct other than Balkaran's comment constituted discriminatory harassment.  *See Tolbert*, 790 F.3d at 439 (plaintiff must show, *inter alia*, discriminatory harassment that was "sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive working environment" (internal quotation marks omitted)).

Regarding the revocation of Plaintiff's telecommuting privileges, the evidence shows that, despite multiple warnings and accommodations from her supervisors, Plaintiff repeatedly proved herself incapable of working remotely and failed to comply with NYCTA's telecommuting policy.  *See supra* Background § I.J.  There is no evidence suggesting that Defendant applied its telecommuting policy selectively or that the requirements imposed on Plaintiff were anything other than standard procedure for all employees.  *See Eka*, 247 F. Supp. 3d at 277 ("Being required to leave the room to drink water certainly does not rise to the level of what courts have recognized as hostile work environment, especially where there is no evidence suggesting that this was not a standard procedure for all [] employees or one justified by the demands of the hospital environment.").  Similarly, the evidence is insufficient to show that Plaintiff being locked out of her office upon returning to work in late January 2021—upsetting as it undoubtedly was to Plaintiff—constituted discriminatory harassment.  For almost four weeks before her return, Plaintiff did not report to work or communicate at all with her supervisors at NYCTA, resulting in her being marked AWOL.  The evidence fails to show that locking Plaintiff out of her office after she had been deemed AWOL was inconsistent with NYCTA policy, that Plaintiff had been singled out for this treatment, or that, notwithstanding Balkaran's comment, the lock-out was prompted by race- and gender-based animus, as opposed to Plaintiff's unexplained disappearance for almost four weeks.  *See Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118–19 (2d Cir. 2010) (summary order) (finding that plaintiff who offered evidence that employer made one racist comment towards her, excluded her from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her failed to establish hostile work environment claim).  Finally, Plaintiff's testimony that a White male was permitted to work remotely due to health conditions is too conclusory to

create a dispute of fact of this point, particularly in the absence of any evidence regarding that employee's compliance with NYCTA's telecommuting policies and expectations. *See Ibok v. Secs. Indus. Automation Corp.*, 369 F. App'x 210 (2d Cir. 2010) (summary order) (affirming district court's dismissal of plaintiff's Title VII racial discrimination claim where the district court found that plaintiff only provided conclusory statements in support of her assertion that other similarly situated employees were accorded preferential treatment).

To be sure, Balkaran's "angry Black woman" comment was reprehensible and, even if not directly about Plaintiff as Defendant argues, perpetuates false, harmful stereotypes about Black women that must be condemned. *See Banks v. Gen. Motors, LLC*, 81 F.4th 242, 272 (2d Cir. 2023) (discussing "the destructive power" of the "angry Black woman" stereotype (quoting *Curry v. Devereux Found.*, 541 F. Supp. 3d 555, 557 (E.D. Pa. 2021))). However, "[f]or [discriminatory] comments, slurs, and jokes to constitute a hostile work environment . . . there must be a steady barrage of opprobrious [discriminatory] comments." *Augustin v. Yale Club of N.Y.C.*, No. 03-CV-1924 (KMK), 2006 WL 2690289, at *21 (S.D.N.Y. Sept. 15, 2006) (quoting *Schwapp*, 118 F.3d at 110), *aff'd sub nom. Augustin v. The Yale Club of N.Y.C.*, 274 F. App'x 76 (2d Cir. 2008) (summary order); *see Stanley v. Mount Sinai Health Sys., Inc.*, No. 21-CV-4619 (VEC), 2023 WL 8355393, at *8 (S.D.N.Y. Dec. 1, 2023) ("[A]ccusing a subordinate of acting like an 'angry Black woman' is inappropriate. Such episodic comments, however, do not rise to the level of being objectively 'severe or pervasive,' which is necessary to establish a prima facie case of a hostile work environment[.]"); *Sosa v. Medstaff, Inc.*, No. 12-CV-8926 (NRB), 2013 WL 6569913, at *6–7 (S.D.N.Y. Dec.13, 2013) (two comments did not qualify as sufficiently pervasive to give rise to hostile work environment claim); *cf. Joseph v. Brooklyn Developmental Disabilities Servs. Off.*, No. 12-CV-4402 (PKC) (CLP), 2016 WL 6700831, at *16 (E.D.N.Y. Sept. 30, 2016) (finding that

plaintiff, who was subject to discriminatory comments and called disparaging names based on his national origin on a daily basis, established hostile work environment claim).

Neither of the two cases relied on by Plaintiff are analogous to the case here.  (*See* Pl.'s Mem. at 19.)  In *Siddiqi v. New York City Health & Hospitals Corp.*, the plaintiff and his Muslim co-workers were "repeatedly threatened" by their supervisor over the course of four years.  572 F. Supp. 2d 353, 373 (S.D.N.Y. 2008).  Though the court in that case allowed the plaintiff's hostile work environment claim to proceed, it noted that "the evidence was thin."  *Id.*  And in *Cherry v. New York City Housing Authority*, the defendant "regularly" made derogatory remarks about the plaintiff's gender.  564 F. Supp. 3d 140, 183 (E.D.N.Y. 2021).  In short, the plaintiffs in those cases were subject to much more "pervasive" discriminatory conduct than that at issue here.

Thus, the Court grants summary judgment to Defendant on Plaintiff's hostile work environment claims under Title VII and the NYSHRL.

### D.   Constructive Discharge

"A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'"  *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (quoting *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)).  "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Trinidad v. N.Y.C. Dep't of Corrs.*, 423 F. Supp. 2d 151, 168 (S.D.N.Y. 2006) (quoting *Chamblee v. Harris & Harris, Inc.*, 154 F. Supp. 2d 670, 675 (S.D.N.Y. 2001)).  If a "reasonable person *subjected to the same conditions as the plaintiff* would have felt compelled to step down," a claim for constructive discharge may

proceed.  *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) (emphasis in original).

     "[C]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004); *see also Nakis v. Potter*, 422 F. Supp. 2d 398, 412 (S.D.N.Y. 2006) ("[A]fter *Suders* '[w]ithout an actionable hostile environment claim, [a] plaintiff's constructive discharge claim must also fail[.]'" (quoting *Ferraro v. Kellwood Co.*, No. 03-CV-8492 (SAS), 2004 WL 2646619, at *11 (S.D.N.Y. Nov. 18, 2004), *aff'd*, 440 F.3d 96 (2d Cir. 2006))).  Because the Court has granted summary judgment to Defendant on Plaintiff's hostile work environment claim, it must grant summary judgment to Defendant on Plaintiff's constructive discharge claim as well.  *See, e.g.*, *Trinidad*, 423 F. Supp. 2d at 168 ("Plaintiff's failure to establish the discriminatory element of her hostile work environment claim is therefore fatal to her constructive discharge claim."); *Nakis*, 422 F. Supp. 2d at 412 (dismissing constructive discharge claim where plaintiff failed to establish predicate hostile work environment claim); *Colas v. City of Univ. of N.Y.*, No. 17-CV-4825 (NGG) (JO), 2019 WL 2028701, at *6 (E.D.N.Y. May 7, 2019) ("[T]he court's dismissal of [p]laintiff's hostile work environment claim necessitates the dismissal of [p]laintiff's constructive discharge claim.").

     Moreover, the record indicates that Plaintiff had decided to retire before becoming aware that she had been marked AWOL and locked out of her office in January 2021.  (*See* Knight Dep. Tr. at 323:172–21 (Plaintiff testifying that she returned to work on Wednesday, January 27, 2021, to "get [her] retirement papers signed . . . [and] to start gathering up [her] belongings"), 343:8–11 ("[T]he first time that I learned about the AWOL that I recall is when I went back into work with my retirement papers.");  Dkt. 107-26 at ECF 4 (email sent by Plaintiff on January 27, 2021 at 9:24 a.m. stating that Plaintiff was "in the process of vacating [her] position"); Def.'s 56.1 ¶ 258

(noting that the locks were changed on Plaintiff's office doors on January 28, 2021).) Because these actions did not influence Plaintiff's decision to retire, they cannot form the basis of Plaintiff's constructive discharge claim. *See Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 311 n.9 (N.D.N.Y. 2013). As such, the evidence supporting Plaintiff's constructive discharge claim is even weaker than that supporting her hostile work environment, despite the fact that constructive discharge is a more demanding standard. *Mandel v. Champion Intern. Corp.*, 361 F. Supp. 2d 320, 327 (S.D.N.Y. 2005) ("The standard for constructive discharge is even higher than that required to prevail on a hostile environment claim[.]").

Accordingly, Plaintiff's constructive discharge claims under Title VII and the NYSHRL are dismissed.

### E.    Retaliation

To establish a prima facie case of retaliation under either Title VII or the NYSHRL, a plaintiff must show: (1) "participation in a protected activity"; (2) "the defendant's knowledge of the protected activity"; (3) "an adverse employment action"; and (4) "a causal connection between the protected activity and the adverse employment action." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). Once the plaintiff has established her prima facie case, the burden shifts to the employer to articulate a nonretaliatory reason for the adverse action. *Zann Kwan*, 737 F.3d at 845. Upon the employer's showing, the burden shifts back to the plaintiff to bring forth evidence establishing that the nonretaliatory reason is "pretext for retaliation." *Id.*

In connection with her retaliation claim, Plaintiff contends that Defendant subjected her to the following adverse employment actions: (1) rejecting Plaintiff from various promotions for which she applied; (2) "not paying [Plaintiff] proper overtime"; (3) "assigning [Plaintiff] to a new

department during the pandemic and refusing to provide her with any help despite her emails requesting assistance and guidance"; (4) "revoking [Plaintiff's] telecommuting privileges at the end of December 2020"; (5) "refusing to investigate [Plaintiff's] complaints of discrimination, harassment, and retaliation"; (6) "lock[ing] [Plaintiff] out of her office"; (7) "falsely marking [Plaintiff] as AWOL while she was out sick"; and (8) forcing Plaintiff to retire early.  (Pl.'s Mem. at 23–24.)[26]  For the reasons already discussed in the context of Plaintiff's discrimination claims, the Court finds that Plaintiff has failed to establish a prima facie case in connection with her applications for promotions and early retirement.  *See supra* Discussion §§ I.B.1, I.D (discussing failure-to-promote claim and constructive discharge claim and finding that Plaintiff has failed to show improper denial of promotions or overtime).  Additionally, aside from Plaintiff's failure to specify or provide proof of occasions when Defendant failed to respond to her internal complaints, the evidence in the record affirmatively disproves her contention that Defendant refused to investigate Plaintiff's complaints.  Defendant has presented documentary evidence that it responded to many of Plaintiff's numerous complaints of discrimination.  Notably, in 2016, NYCTA's Office of Equal Employment Opportunity ("EEO") met with Plaintiff and concluded that there "[was] an insufficient basis to find that NYCT[A's] . . . policies prohibiting discriminatory conduct may have been violated."  (*See* Dkt. 114-8.)  Moreover, Plaintiff declined to meet with the EEO investigator who contacted Plaintiff to set up an interview regarding the issues Plaintiff raised in her December 2020 email to Andrews.  (Dkt. 107-26.)  Finally, Plaintiff

---

[26] As with Plaintiff's discrimination claim, the Court only considers the adverse employment actions expressly raised by Plaintiff.  *See supra* note 24.  Additionally, Plaintiff argues that Defendant's actions "made her sick because of the stress, anxiety and panic attacks [Plaintiff] was suffering from."  (Pl.'s Mem. at 23.)  However, "extreme stress and anxiety . . . are insufficient to establish an adverse employment action."  *See Gordon v. N.Y.C. Bd. of Educ.*, No. 01-CV-9265 (SAS), 2003 WL 169800, at *6 (S.D.N.Y. Jan. 23, 2003) (internal quotation marks omitted).

has failed to offer any evidence indicating that her assignment to a new department during the COVID-19 pandemic was "a demotion in form or substance," and as such, the Court does not find that Plaintiff's transfer "rise[s] to the level of a materially adverse employment action." *See Mullen v. City of New York*, No. 02-CV-103 (SAS), 2003 WL 21511952, at *6 (S.D.N.Y. July 1, 2003); *see Santiesteban v. Nestle Waters N. Am., Inc.*, 61 F. Supp. 3d 221, 242 (E.D.N.Y. 2014) (finding plaintiff's claim that his manager "ignored [plaintiff] completely" after plaintiff filed complaint did not "evidence a materially adverse employment action").

Regarding the other adverse employment actions that Plaintiff claims,[27] the Court agrees with Defendant that Plaintiff cannot establish causation or a retaliatory motive. (Def.'s Mot. at 18–22.) In response, Plaintiff argues that her "complaints [were] frequent and in close proximity to the adverse employment actions." (Pl.'s Mem. at 24.) However, this argument is conclusory. Other than her early retirement, Plaintiff makes no attempt to connect any of the adverse employment actions she claims to her protected activity, and the Court is not obligated to do so on her behalf. (*See id.* at 24 (noting that "[Plaintiff's] forced early retirement (i.e., constructive discharge) . . . was only [one] month after her last complaint . . . and only [two] days after [Plaintiff's] return from sick leave," without mentioning any other purported adverse actions)); *see Bey v. New York*, No. 11-CV-3296 (JS) (WDW), 2013 WL 3282277, at *6 (E.D.N.Y. June 25, 2013) ("[I]t is well-established that courts cannot make a party's arguments for it or fill in the

---

[27] The Court notes that "[t]o establish an adverse action for purposes of a retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Bacchus*, 137 F. Supp. 3d at 242–43 (cleaned up). "[A] broader scope of actions may qualify as 'adverse employment actions' for purposes of a retaliation claim than those prohibited by Title VII's antidiscrimination provisions, and an employee is not limited to only those actions that materially affect the terms and conditions of her employment." *Id.*

blanks on that party's behalf." (internal quotation marks omitted)).  Nevertheless, the Court briefly considers the remaining adverse actions referenced by Plaintiff.

First, Plaintiff fails to establish a causal connection between her protected activity and Defendant's failure to timely pay Plaintiff for working overtime.  Plaintiff focuses on overtime she accrued through her work on a special project in 2017 and as a test monitor in December 2019.  As to the first instance, Plaintiff is unsure exactly when the untimely payment situation occurred, (Knight Dep. Tr. at 147:8–10), and thus, the Court is unable to analyze whether it was sufficiently close in time to any protected activity to establish causation.  And while Plaintiff testified that she believed the December 2019 incident was in retaliation for her filing the present lawsuit in March 2019, (*id.* at 162:20–163:9), the nine-month gap between the protected activity and purported retaliation is too great to give rise to an inference of causation.  *See Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 00-CV-6307 (KMK), 2007 WL 259937, at *18 (S.D.N.Y. Jan. 29, 2007) (finding that five-month gap between protected activity and alleged retaliation was "too great" to give rise to inference of retaliation), *aff'd*, 307 F. App'x 596 (2d Cir. 2009) (summary order); *see also Dechberry v. N.Y.C. Fire Dep't*, 124 F. Supp. 3d 131, 153–55 (E.D.N.Y. 2015) ("[D]istrict courts within the Second Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." (internal quotation marks omitted)).

The remaining three actions—revoking Plaintiff's telecommuting privileges, locking Plaintiff out of her office, and marking Plaintiff AWOL—all occurred between December 2020 and January 2021.  To the extent that Plaintiff attempts to connect these actions to the present lawsuit, the passage of time is once again too great to allow for an inference of causation.  *See Dechberry*, 124 F. Supp. 3d at 153–55.  And while Plaintiff's December 31, 2020 complaint to

Andrews could give rise to an inference of causation as to Defendant locking Plaintiff out of her office and marking Plaintiff AWOL in January 2021,[28] Defendant has offered a nonretaliatory reason for these actions—Plaintiff's failure to comply with NYCTA's sick leave policies, which included Plaintiff disappearing and not communicating with her supervisors for almost four weeks. *See supra* Background § I.J.  For her part, Plaintiff has failed to identify sufficient evidence that Defendant's explanation was wholly or partly pretextual.  "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage," *see Zann Kwan*, 737 F.3d at 847, and the only other evidence that Plaintiff highlights is a comment about the present lawsuit that Balkaran made several months earlier—*i.e.*, asking Plaintiff if she would still sue NYCTA "if [she] had [to do it] over."  However, because Balkaran made this comment prior to Plaintiff's December 2020 complaint, the Court does not find it to be sufficiently probative of a retaliatory motive.  Thus, Defendant is entitled to summary judgment on Plaintiff's Title VII and NYSHRL retaliation claims.

## III.    NYCHRL Claims

The NYCHRL makes it unlawful "for an employer or employee or agent thereof, because of the actual or perceived . . . race, . . . , color, . . . [or] gender . . . of any person . . . to discriminate against such person in . . . terms, conditions, or privileges of employment."  NYCHRL § 8-107(1)(a).  The NYCHRL is "more protective" than either Title VII or the NYSHRL, and must be construed "'broadly' and 'in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'"  *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 67 n.2

---

[28] Plaintiff's telecommuting privileges were revoked one day prior to her December 2020 complaint. (*See* Dkts. 107-24, 109-46.)  Thus, Plaintiff is unable to establish that the revocation of her telecommuting privileges was in retaliation for protected activity because said protected activity had not yet occurred. *See Moy v. Perez*, 712 F. App'x 38, 40 (2d Cir. 2017) (summary order) (explaining that protected activity must be prior to adverse action).

(S.D.N.Y. 2016) (quoting *Albunio v. City of New York*, 947 N.E.2d 135, 137 (N.Y. 2011)).  "To prevail on liability, the plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110–11 (2d Cir. 2013).  "[S]ummary judgment is appropriate if the record establishes as a matter of law that discrimination or retaliation played no role in the defendant's actions."  *Montgomery v. N.Y.C. Transit Auth.*, 806 F. App'x 27, 31 (2d Cir. 2020) (summary order) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015)).

In support of her NYCHRL claims, Plaintiff merely states that the Court is required to "constru[e] the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  (Pl.'s Mem. at 21 (quoting *Mihalik*, 715 F.3d at 109).)  "However, '[s]imply stating that the NYCHRL encompasses a broader standard does not absolve [Plaintiff] from putting forth evidence' to support her discrimination claims, because even under the NYCHRL 'a defendant is not liable if the plaintiff fails to prove the [challenged] conduct is caused at least in part by discriminatory . . . motives.'"  *See Gordon-Mallett*, 2024 WL 1513910, at *15 (first quoting *Bloomberg L.P.*, 967 F. Supp. 2d at 862; then quoting *Vasquez v. N.Y.C. Dep't of Educ.*, 667 F. App'x 326, 328 (2d Cir. 2016) (summary order)).  As discussed throughout this Memorandum and Order, Plaintiff has not shown that she was treated less well because of a discriminatory motive.  Accordingly, Plaintiff's claims fail even under the NYCHRL's "more lenient standards."  *See Valerio v. Metro. Transp. Auth.*, No. 23-CV-1938 (DLC), 2024 WL 2305386, at *9 (S.D.N.Y. May 20, 2024), *appeal filed*, No. 24-1614 (2d Cir. June 18, 2024).

## MOTION TO SEAL

Defendant moves to seal or redact several documents filed in support of its briefing, including documents concerning non-party employment records, Plaintiff's salary history, and

doctors' notes and/or medical requests submitted by Plaintiff during the course of her employment. (*See* Def.'s Mem. of Law Supp. Mot. to Seal, Dkt. 108-1 ("Mot. to Seal"), at 1; Dkt. 108-2 ¶¶ 4–15.)  Plaintiff does not oppose Defendant's motion.

"The common law right of public access to judicial documents is firmly rooted in our nation's history."  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "In light of the presumption in favor of public access, the Second Circuit has established a three-part test for determining whether documents may be placed under seal."  *In re IBM Arb. Agreement Litig.*, No. 21-CV-6296 (JMF), 2022 WL 3043220, at *1 (S.D.N.Y. Aug. 2, 2022).  First, the Court must determine whether the materials at issue are "judicial documents" to which a presumption of access attaches.  *Lugosch*, 435 F.3d at 119.  "Documents submitted for consideration with summary judgment motions are considered, as a matter of law, 'judicial documents to which a strong presumption of access attaches.'"  *Mark v. Gawker Media LLC*, No. 13-CV-4347 (AJN), 2015 WL 7288641, at *1 (S.D.N.Y. Nov. 16, 2015) (quoting *Lugosch*, 435 F.3d at 121); *see also Brown v. Maxwell*, 929 F.3d 41, 50 (2d Cir. 2019) (requiring "compelling" reasons to seal documents filed "in connection with dispositive motions such as motions for dismissal or summary judgment").  Thus, the Court finds that the documents submitted in connection with Defendant's motion for summary judgment are "judicial documents."  *See Lugosch*, 435 F.3d at 123 (concluding that documents submitted as part of summary judgment briefing were "judicial documents" for the purposes of sealing/redaction request).

At step two, the Court must determine "[t]he weight to be accorded" to the presumption of access, which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  *Mirlis v. Greer*, 952 F.3d 51, 59 (2d Cir. 2020) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049

(2d Cir. 1995)).  "The general and deeply rooted rule is that the presumptive right of access is afforded 'strong weight' when applied to documents that play a central role in 'determining litigants' substantive rights—conduct at the heart of Article III.'"  *Id.* at 60 (quoting *Amodeo*, 71 F.3d at 1049).  Here, in light of the fact that the documents that Defendant requests to seal were submitted in support of a motion for summary judgment, "the Court determines the weight of the presumption of access to these documents to be significant under both the common law and First Amendment analysis."  *See Mark*, 2015 WL 7288641, at *2 (citing *Lugosch*, 435 F.3d at 121) ("[D]ocuments submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment.").

At step three, the Court must assess whether there are countervailing "factors that legitimately counsel against disclosure of the judicial document, and balance those factors against the weight properly accorded the presumption of access."  *Mirlis*, 952 F.3d at 59.  "Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure."  *Cavender v. U.S. Merch. Marine Acad.*, No. 20-CV-2063 (PKC) (ST), 2020 WL 3304538, at *3 (E.D.N.Y. June 18, 2020) (internal quotation marks and citation omitted).  Courts also "consider the degree to which the subject matter is traditionally considered private rather than public."  *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995).  "Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public."  *Id.*

Here, Defendant argues that the documents at issue contain information "of a traditionally private nature."  (Mot. to Seal at 3 (internal quotation marks omitted).)  The Court agrees, with

one exception.  First, courts have frequently found that third-party employees' privacy interest in their employment records outweigh the public's interest in disclosure.  *E.g.*, *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 707 (S.D.N.Y. 2017); *Hernandez v. Off. of Comm'r of Baseball*, No. 18-CV-9035 (JPO), 2021 WL 1226499, at *12 (S.D.N.Y. Mar. 31, 2021).  Likewise, "[a]n individual generally 'maintains significant privacy rights to her medical information,' and courts 'regularly seal' such information."  *Robinson v. De Niro*, No. 19-CV-9156 (LJL) (KHP), 2022 WL 2712827, at *2 (S.D.N.Y. July 13, 2022) (quoting *Valentini v. Grp. Health Inc.*, No. 20-CV-9526 (JPC), 2020 WL 7646892, at *2 (S.D.N.Y. Dec. 23, 2020)).  Accordingly, the Court grants Defendant's motion as to the nonparty employment records, (Dkts. 108-7 to -14), and documents containing Plaintiff's medical/health information, (Dkts. 108-5 to -6).[29]

However, the Court denies Defendant's motion as to Plaintiff's salary information.  (Dkt. 108-4.)  While salary information may warrant redaction in some instances, here, Plaintiff already filed the same document at issue on the public docket, (Dkt. 109-5), and Defendant did not object.  *See Shetty v. SG Blocks, Inc.*, No. 20-CV-550 (ARR) (MMH), 2021 WL 4959000, at *4 (E.D.N.Y. Oct. 26, 2021) ("The Second Circuit and courts within it have repeatedly found sealing improper where the relevant material was already made public.").  Nevertheless, because Plaintiff has already made this document publicly available, there is no need for Defendant to refile it on the public docket.  Accordingly, the documents filed under seal may remain so.

---

[29] Although the medical information contained in the documents is vague at best, the Court nevertheless grants Defendant's motion as to those exhibits out of an abundance of caution.

**CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment is granted and Defendant's motion to seal/redact is granted in part and denied in part.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.


/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2024
      Brooklyn, New York