Christine Knight

28 Pony Court

Smyrna, DE 19977

Email: 4YoMind@gmail.com

917-674-7300

**FILED**
**Nov 23, 2024, 1:10 PM**
**in the Clerk's Office**
**U.S. District Court,**
**EDNY, Brooklyn**
**Pro Se Office via**
**Box.com**

Clerk's Office
Filed Date: Received
on November 27, 2024
JVC
U.S. DISTRICT
COURT
EASTERN DISTRICT
OF NEW YORK
BROOKLYN OFFICE

November 23, 2024

Re: Motion for Reconsideration Knight v. MTA-NYCT, 19-CV-1428

Dear Pro Se Office,

I am writing to respectfully request that the court disregard the document of my motion I inadvertently submitted earlier this morning at approximately 6:00 AM, as it was not the correct version intended for filing.

Please find attached the corrected copy of my Motion for Reconsideration for the court to review and rule. I sincerely apologize for any confusion or inconvenience this may have caused and appreciate your understanding in this matter.

Should you require any additional information or clarification, please do not hesitate to contact me by phone or email.

Thank you for your assistance.

Sincerely,


/s/

Christine Knight

28 Pony Court

Smyrna, DE 19977

(917) 674-7300

4yomind@gmail.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

CHRISTINE N. KNIGHT,

Plaintiff,


v.


METROPOLITAN TRANSPORTATION AUTHORITY -NEW YORK CITY TRANSIT

Defendant.

------------------------------------------------------------------ X

Case No.: 19-CV-1428 (PKC) (LB)


## <u>PLAINTIFF'S MOTION FOR RECONSIDERATION</u>

## I. INTRODUCTION

Plaintiff Christine N. Knight respectfully submits this Motion for Reconsideration pursuant to Local Civil Rule 6.3 and Rule 54(b) of the Federal Rules of Civil Procedure, seeking reconsideration of the Court's Opinion and Order dated September 30, 2024, granting Defendant Metropolitan Transportation Authority- New York City Transit's ("MTA- NYCT") Motion for Summary Judgment in part with respect to Plaintiff's New York City Human Rights Law ("NYCHRL") claims. Plaintiff moves the Court to reconsider its ruling on these claims based on the Defendant's failure to adequately address Plaintiff's arguments under NYCHRL in its reply to Plaintiff's opposition.

Given that NYCHRL's standard for retaliation claims broader view, it is imperative that the Court independently considers these claims under NYCHRL's protections. MTA- NYCT's exclusive focus on Title VII cases disregards Plaintiff's evidence of retaliation in a context where NYCHRL recognizes actions that would deter a reasonable person from engaging in protected activity. Plaintiff's evidence aligns with NYCHRL's anti-retaliation mandate, demonstrating that Defendant's adverse actions went beyond isolated instances and formed a persistent pattern of retaliation.

## II. STANDARD OF REVIEW

A motion for reconsideration is appropriate where "the court overlooked controlling decisions or factual matters that were put before it on the underlying motion." Shrader v. CSX Transp., Inc.,

70 F.3d 255, 257 (2d Cir. 1995). Reconsideration may also be granted "to correct a clear error or prevent manifest injustice." Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004).

## III. BACKGROUND

I. Factual Background

Plaintiff respectfully refers the Court to her 56.1 Counterstatement of Material Facts pursuant to Local Rule 56.1 ("CMF") and the Dermesropian Decl. with Exhibits, all of which are incorporated herein by reference. (ECF 109)

A. Plaintiff's Employment History and Qualifications

Plaintiff, Christine N. Knight, is an African American woman who began her employment with MTA - New York City Transit on July 22, 1985. Over her 32-year tenure in the Production, Planning, and Scheduling Group, Plaintiff has demonstrated a strong commitment to professional development. She holds a Bachelor of Arts degree from The College of New Rochelle and a Certificate in Women's Labor Studies from Cornell University. Additionally, Plaintiff has taken numerous job-related technical certification courses provided by MTA-NYCT to increase her promotional opportunities. These courses included, but were not limited to:

- Subway Cars Familiarization
- SMS - Scheduled Maintenance System
- Contracts Management Training
- Talon MMS - Material Forecasting
- CMS - Material Forecasting

- Various computer and management preparation courses.

These credentials, along with Plaintiff's extensive hands-on experience, reflect her qualifications and dedication to her role in the Production, Planning, and Scheduling Group.

B. Plaintiff's Requests for Promotions

Plaintiff's last promotion occurred in 1999, when she was stepped up from a Level II Analyst to an Associate Analyst, the highest rank within the Analyst title. Since 1999, Plaintiff has consistently sought promotional opportunities within the Production Planning Group and throughout MTA-NYCT. She has actively expanded her responsibilities, taking on additional duties such as managing contracts for subway car doors, floors, seats, motormen cabs, subway hold cars, motors, wheels, compressors, overhaul kits, product deliveries, material cost analysis, and waste management.

Despite her efforts and qualifications, Plaintiff was repeatedly denied promotions, even while performing the same or similar work as her male colleagues. Notably, in 2017, Plaintiff applied for the position of Director, Production Planning, SMS, a role within her department where she had served for nearly three decades. Plaintiff contends that she was denied this promotion because of her race and gender.

Defendant has argued that Plaintiff did not qualify for the Director position because she lacked a business degree. However, Plaintiff's application and résumé were pre-screened and approved by Defendant's own Human Resources Department, demonstrating that she met the qualifications to

proceed to the interview stage. Despite passing pre-screening in both 2014 and 2017, Plaintiff

was denied an interview by Production Planning management, obstructing her pathway to

professional growth. This denial, combined with a lack of promotions for over 22 years, has left

Plaintiff at the bottom of the Associate Analyst salary range.

C. Evidence of Disparate Treatment in Promotions

Defendant's assertion that Plaintiff was unqualified for certain positions, such as Senior Quality

Control Specialist, omits key information. In 2014, a colleague, Cheryl Maldonado, was

promoted to Senior Quality Control Specialist II within the Production Planning Group by J.

Rodgers, the retired manager. While the position required engineering and supervision

qualifications, Maldonado, who lacked these credentials, was still promoted. When Maldonado

vacated the role for a managerial position after one year, Plaintiff applied for the vacancy.

However, she was denied the promotion despite holding a non-engineering bachelor's degree,

similar to Maldonado's. This denial occurred despite Assistant Chief Officer Lonnie Meeks

approving the promotion.

The inconsistent application of qualifications highlights a targeted effort by Defendant to deny

Plaintiff promotional opportunities. These decisions, particularly in light of Plaintiff's extensive

experience and qualifications, reflect a pattern of disparate treatment and retaliation that

obstructed her career advancement.

**IV. ARGUMENT**

Under NYCHRL, retaliation claims are evaluated using a more lenient standard than Title VII, requiring only that retaliation was a "motivating factor" in an adverse action rather than the "but-for" causation typically required under federal law. NYCHRL protects employees from actions that "would be reasonably likely to deter a person from engaging in protected activity." *See Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009). The NYCHRL defines the activities protected against retaliation more broadly and "protects plaintiffs who oppose any practice forbidden under" the NYCHRL. N.Y.C. Admin. Code. § 8- 107(7).

> Rather than requiring a plaintiff to show an adverse employment action, [the NYCHRL] only requires [her] to show that something happened that was reasonably likely to deter a person from engaging in protected activity." Xiang v. Eagle Enters., LLC, No. 19 Civ. 1752, 2020 WL 248941, at *9 (S.D.N.Y. Jan. 16, 2020) (alterations in original) (quoting Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012)).

Plaintiff has established "something happened" and the negative disparate treatment that followed makes it reasonably likely that a person would question their right to engage in protected activity. Plaintiff presents evidence that MTA- NYCT's adverse actions, including disciplinary measures, harmful attendance classifications, and procedural obstacles, are consistent with a retaliatory intent under NYCHRL standards. Plaintiff has presented substantial evidence that Defendant engaged in retaliatory actions intended to intimidate, pressure, and punish her for engaging in protected activity. These actions reflect a pattern of hostile behavior that is actionable under NYCHRL's expansive standard. Defendant's motion attempts, unsuccessfully, to dismiss Plaintiff's legitimate complaints as mere slights. Plaintiff argues the following actions by Defendant make clear Defendant's motion must be denied.

A. Defendant's Failure to Address Plaintiff's NYCHRL Arguments in Its Reply Constitutes a Concession Warranting Reconsideration

Defendant MTA- NYCT failed to respond to Plaintiff's opposition arguments concerning her NYCHRL claims in its reply brief, focusing solely on arguments under Title VII. This omission is material to the Court's summary judgment ruling, as NYCHRL claims are evaluated under a broader, more protective standard than Title VII claims, requiring only that adverse actions be "reasonably likely to deter a person from engaging in protected activity." See Williams v. N.Y.C. Housing Auth., 61 A.D.3d 62, 71 (1st Dep't 2009). By failing to address Plaintiff's specific NYCHRL arguments, Defendant has effectively conceded the arguments raised, warranting reconsideration of the Court's ruling. Courts in this Circuit recognize that arguments not raised in reply are often deemed waived or abandoned. See, e.g., Rodriguez v. Vill. of Ossining, No. 11-cv-2061, 2013 WL 5236583, at *5 (S.D.N.Y. Sept. 17, 2013).

B. Plaintiff Has Sufficiently Established a Prima Facie Case of Retaliation Under NYCHRL's Broader Standard

Under NYCHRL, a plaintiff must demonstrate that they engaged in a protected activity, that the employer was aware of this activity, and that the employer took actions reasonably likely to deter a person from engaging in such activity. Unlike federal standards, NYCHRL does not require the adverse action to materially affect the terms and conditions of employment. Given this more lenient standard, Plaintiff's claims should survive summary judgment based on the following:

1.      Engagement in Protected Activity: Plaintiff engaged in protected activity by making at least 39 complaints of discrimination, harassment, and retaliation between 2013 and 2020. These complaints included both internal reports and the filing of a federal lawsuit on March 12, 2019, constituting protected activity under NYCHRL. On March 12, 2019, Plaintiff initiated this action as a pro se litigant and subsequently retained counsel and filed a Third Amended Complaint on October 20, 2021 ("Complaint"), which is incorporated by reference and annexed as Exhibit 2 to the Dermesropian Decl. (ECF 109).

2.      Employer's Awareness of the Complaints: The record reflects that the employer was aware of Plaintiff's complaints (Exhibit 40 to the Dermesropian Decl. (ECF 109)). Joel Andrews from NYCT testified that NYCTA opted not to investigate Plaintiff's numerous complaints. Additionally, Plaintiff's supervisor questioned whether Plaintiff "would still sue Transit" again, further evidencing the employer's knowledge of her complaints. (see Knight's Dep. Tr. 216:11-217:4)


3.      The Defendant's Justification for Not Investigating the Discrimination Complaint is Pretextual:

The Defendant's assertion that it would be "too onerous" to determine the race or ethnicity of each analyst is inextricably tied to the obligation to investigate a race-based discrimination complaint. A meaningful investigation into such a complaint necessarily requires identifying the race or ethnicity of the individuals involved to determine whether disparate treatment or discriminatory patterns exist. By claiming that it was too onerous to determine the race of each

analyst, the Defendant effectively admitted that it was too onerous to conduct the investigation itself. These are not distinct tasks—they are one and the same.

The Defendant cannot credibly argue that it fulfilled its duty to investigate while simultaneously refusing to undertake the fundamental step of identifying relevant racial or ethnic information. Investigating a race-based discrimination claim without considering race is inherently illogical and renders any purported investigation inadequate. Thus, the Defendant's explanation for its inaction is a pretext designed to obscure its failure to meaningfully address the complaint.

This framing ties the Defendant's justification directly to the inadequacy of the investigation while addressing the court's concern about accuracy. It makes the connection between the two tasks undeniable and shows how the Defendant's reasoning fails to hold up under scrutiny.

4.      Adverse Actions Taken: Plaintiff experienced numerous adverse actions, including:

•       Multiple rejections for positions for which she applied without interviews, despite passing prescreening.

•       Denial of proper overtime pay.

•       Transfer to a new department during the pandemic without support, creating a hostile work environment.

•       Revocation of telecommuting privileges, despite her high risk for COVID-19.

•       Refusal to investigate her complaints, resulting in an ongoing hostile work environment.

- Locking Plaintiff out of her office and falsely marking her as AWOL despite being on medical leave.

- Upon Plaintiff's retirement February 1, 2021, Defendant refused to pay any of Plaintiff's accrued time, (Vacation Days, Personal Leave Days, Holidays, Overtime, Sick Days).

- Defendant refused to pay Plaintiff for payroll lag time that all retirees are entitled to upon retirement.

- Defendant illegally withheld Plaintiffs biweekly salary for the entire month of January, 2021 when Plaintiff was out sick for 17 workdays. Until today, Plaintiff has not been paid approximately $25,000 in total and has never been given a reason as to why Defendant will not pay her for her time. Defendant's failure to release Plaintiff's legitimate earnings, and time accrual, has adversely reduced and negatively impacted both Plaintiff's pension and her social security payments for the rest of Plaintiff's life.

Under NYCHRL, these actions constitute adverse employment actions, as they would likely deter a reasonable person from continuing to make complaints or raise legal claims against the employer.

5.     Constructive Discharge: Plaintiff's forced early retirement in February 2021—only one month after her last complaint in December 2020 and shortly after returning from sick leave—strengthens her claim. Constructive discharge due to ongoing hostility, stress, and anxiety is recognized as a significant adverse action, especially given the close temporal connection to her protected activity under NYCHRL.

6.      Proximity in Time: The close temporal proximity between Plaintiff's complaints and the adverse actions supports an inference of retaliatory intent. Under the broad protections of NYCHRL, any retaliatory conduct that could deter a reasonable employee from engaging in protected activity is actionable. Plaintiff Christine Knight engaged in multiple instances of protected activity, including filing numerous formal complaints, advocating for workplace safety, and opposing discriminatory practices. The temporal proximity between these protected activities and the retaliatory actions by MTA - New York City Transit (MTA - NYCT) underscores a clear pattern of retaliation, further supporting Plaintiff's claim under NYCHRL.

A.      Protected Activity: Filing EEOC Complaint (2017)

Plaintiff filed a complaint with the EEOC in 2017 regarding Defendant's refusal to pay her for mandated overtime. This refusal, combined with granting higher overtime pay percentages to a male colleague, constituted actionable discrimination. Plaintiff's persistence in seeking redress, including filing a formal complaint with the Department of Labor, was met with retaliation, such as heightened scrutiny by management and delayed payment for her work. This marked the beginning of a pattern of retaliatory behavior.

B.      Protected Activity: Filing Federal Lawsuit (March 2019)

Plaintiff filed a federal lawsuit on March 12, 2019, after receiving a right-to-sue letter from the EEOC. This act of opposing unlawful practices constitutes protected activity under NYCHRL. In direct response, Defendant subjected Plaintiff to increased micromanagement, exclusion from promotional opportunities, and unjustified scrutiny. These retaliatory measures intensified over time, creating a hostile work environment.

C.     Protected Activity: Advocating for COVID-19 Safety Measures

(March–November 2020)

Throughout 2020, Plaintiff consistently raised concerns about unsafe working conditions and her

high-risk health status amid the COVID-19 pandemic. On March 16, 2020, despite Governor

Cuomo's directive for non-essential employees to stay home, Defendant required Plaintiff to

work in person for three additional days while allowing others to telecommute. Plaintiff's emails

to management, including her September 29, 2020 communication highlighting health risks and

unsafe practices, constitute protected activity. In retaliation, Defendant revoked Plaintiff's

telecommuting privileges on October 28, 2020, forcing her to work in unsafe conditions.


D.     Protected Activity: Opposing Unsafe Workplace Gatherings (November 2020)

Plaintiff objected to management-sanctioned gatherings in November 2020 that violated

COVID-19 protocols. This protected activity was followed by retaliatory actions, including the

filing of pretextual OATH charges and the escalation of hostile treatment by supervisors.

Defendant's retaliatory conduct intensified, reflecting a deliberate effort to silence Plaintiff's

opposition.

E.     Protected Activity: Complaining About Retaliation and Harassment (December

2020)

Plaintiff repeatedly complained about ongoing retaliation, harassment, and discriminatory

treatment, including the coercive demands to submit telecommuting forms despite known

technical obstacles. In December 2020, Defendant falsely classified Plaintiff as AWOL during

her documented medical leave. This adverse action closely followed Plaintiff's continued

advocacy for her rights and constituted retaliation designed to undermine her credibility and force her resignation.

F.       Protected Activity: Engaging in Final Advocacy During Retirement Process (January 2021)

In January 2021, Plaintiff sought to resolve her employment disputes during her final days before retirement. She raised concerns about withheld pay, unprocessed retirement paperwork, and access to her personal belongings. Defendant retaliated by locking Plaintiff out of her office, withholding her salary for the entire month of January, and failing to process her accrued benefits. These retaliatory actions directly followed Plaintiff's continued protected activity and were intended to create unnecessary hardship.


Proximity in Time Supports Retaliation Claim Under NYCHRL

The close temporal proximity between Plaintiff's protected activities and Defendant's adverse actions creates a compelling inference of retaliatory intent. Each instance of Plaintiff's engagement in protected activity—filing formal complaints, opposing unsafe practices, and advocating for fair treatment—was met with swift and escalating retaliation, including:


•       Revocation of telecommuting privileges (October 28, 2020) following Plaintiff's September 29, 2020 email regarding unsafe conditions.

•       Filing of baseless OATH charges (November 2020) after Plaintiff opposed unsafe workplace gatherings.

•       AWOL classification (December 2020) shortly after Plaintiff's continued complaints about retaliation and harassment.

•       Withholding of salary and benefits (January 2021) following Plaintiff's efforts to finalize her retirement paperwork.

Under NYCHRL's broader retaliation standard, these actions were designed to intimidate, isolate, and punish Plaintiff for engaging in protected activity. The consistent pattern of retaliation, tied closely in time to Plaintiff's advocacy, satisfies NYCHRL's requirement that retaliatory actions be reasonably likely to deter a person from engaging in protected activity. Plaintiff respectfully requests that the Court recognize this pattern and allow her NYCHRL retaliation claims to proceed to trial.

7.      Circumstantial Evidence of Retaliatory Intent: Plaintiff's supervisor, Balkaran, explicitly asked Plaintiff, "If you had it to do over, would you still sue Transit?" ((Exhibit 61 to the Dermesropian Decl. (ECF 109))(Knight's Dep. Tr. 216:11-21). This pointed inquiry strongly implies a retaliatory motive and dissatisfaction with Plaintiff's prior protected activities, including her complaints and this lawsuit. Such a statement reveals an unguarded moment where Balkaran's underlying motives and intentions toward Plaintiff's protected activity are brought to light, creating a significant issue of material fact regarding whether Plaintiff's legal actions and complaints triggered the adverse actions she experienced.

A jury could reasonably infer from this question that Defendant's adverse actions, including delays in approving Plaintiff's overtime pay, improperly marking her as AWOL, and escalating disciplinary measures, were influenced by retaliatory intent. This inference is further bolstered by the proximity of Plaintiff's protected activity to these adverse actions and Balkaran's demonstrated hostility toward Plaintiff's legal advocacy.

Given these factors, Plaintiff has presented compelling evidence that Defendant's conduct was at least partly motivated by retaliatory intent, as evidenced by Balkaran's revealing inquiry. Under NYCHRL's broader retaliation standard, these circumstances strongly support the conclusion that Defendant's actions were reasonably likely to deter Plaintiff or others from engaging in further protected activity. These facts satisfy the NYCHRL requirements for establishing a claim of retaliation.

C. NYCHRL Claims Should Proceed to Trial Due to Defendant's Concession and Broader Protections Under NYCHRL

NYCHRL claims are intended to be liberally construed, providing greater protection than federal law. Courts consistently recognize that NYCHRL claims should be analyzed separately and independently from federal claims. See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013). Defendant's failure to rebut Plaintiff's NYCHRL-specific arguments in reply leaves unresolved genuine issues of material fact, precluding summary judgment on these claims. Plaintiff's NYCHRL claims thus warrant full consideration by a jury.

Knight files a complaint with MTA- NYCT about consistent retaliation she has experienced, particularly around being denied work-from-home accommodations and being pressured to submit weekly telecommuting forms despite ongoing technical issues with her company-issued laptop. After her complaint, MTA- NYCT escalates actions against her by labeling her as "AWOL" despite clear communications about her sick leave, withholding pay, and demanding

her to return to the office despite the unresolved IT issues, without addressing her doctor's note indicating she is high-risk for COVID-19.

**Title VII (Materially Adverse Standard):**

Under Title VII, Defendant MTA - New York City Transit (MTA - NYCT) wrongly argued that its actions were not "materially adverse" for the following reasons (though Plaintiff contends they were adverse based on the facts presented)[1]:

- Technical Classification of "AWOL" Status:

  Defendant argued that labeling Plaintiff as "AWOL," while undeniably harmful to her reputation and morale, was merely a procedural classification that did not directly impact her title, pay (assuming the withholding was temporary, though Plaintiff has not been paid to date), or core job responsibilities (Plaintiff strongly disputes this argument, as the "AWOL" designation created a false narrative of misconduct, damaged her professional credibility, and was used as a pretext to justify further adverse action).

- Alleged Lack of Career Impact:

  Defendant contended that requiring Plaintiff to report to the office during a global pandemic or troubleshoot her non-functional laptop (regardless of the challenges placed on her by the defendant that made it nearly impossible for the plaintiff to adhere to) did

---

[1] Plaintiff argues that Defendant's actions were indeed "materially adverse" under Title VII, as they had a profound effect on her professional reputation, financial stability, and emotional well-being. The cumulative impact of these actions—being falsely labeled as AWOL, forced into unsafe working conditions, and subjected to financial deprivation—would dissuade a reasonable employee from engaging in protected activity, meeting the Title VII standard for retaliation. Moreover, the Defendant's ongoing refusal to pay Plaintiff her rightful earnings magnifies the lasting adverse impact of its actions.

not materially affect her professional role, status, or long-term career opportunities (plaintiff argues, however, that these actions directly hindered her ability to perform her job effectively, as the lack of access to essential work tools impeded her ability to meet expectations. The psychological and physical toll of being forced into unsafe work conditions further undermined her ability to focus on her career trajectory).

- No Alleged Permanent Financial Harm:

  Defendant wrongfully claimed that withholding Plaintiff's pay was a temporary administrative delay, attempting to make the argument that it did not permanently alter her salary or benefits and therefore did not constitute a materially adverse action. (Plaintiff disputes this argument, as the withheld pay, totaling approximately $25,000, remains unpaid to this day, causing lasting financial harm. This delay has also adversely impacted Plaintiff's pension and Social Security benefits, which are calculated based on lifetime earnings. These long-term financial consequences contradict Defendant's characterization of the withholding as "temporary" and underscore the severe impact of its retaliatory conduct).

Defendant may have argued that MTA - New York City Transit's (MTA - NYCT) actions were merely frustrating and inconvenient for Plaintiff, failing to meet Title VII's stricter standard, which requires clear, tangible setbacks in salary, position, or career impact to qualify as materially adverse. From this perspective, Defendant sought to frame its conduct as procedural or administrative rather than retaliatory, claiming that these actions might not be considered materially adverse enough to deter a "reasonable worker" from filing a complaint. (However, plaintiff argues that by minimizing the cumulative impact of its actions, Defendant disregards the

broader context of the harm inflicted on Plaintiff, undermining the notion that such actions would not deter a "reasonable worker" from filing a complaint under Title VII.)

**NYCHRL (Deterrence-Based Standard):**

Under the NYCHRL, however, these actions would likely be considered retaliatory because:

- **Reasonably Likely to Deter Reporting:** By repeatedly labeling Christine as AWOL despite being informed of her medical status, MTA- NYCT's actions could reasonably discourage her or others from filing complaints in the future due to the fear of unjust punishment.
- **Broader Interpretation of Retaliation:** Withholding her pay and requiring her to return to work, especially while other colleagues were allowed to work remotely and were not subjected to connectivity challenges, could be seen as retaliatory pressures. These actions create a hostile work environment that under NYCHRL's broader standard could deter anyone from making further complaints.
- **Unaddressed Health Risks:** Ignoring Christine's documented high-risk COVID-19 status can be reasonably seen as callous and punitive, making her feel unsafe and undervalued. NYCHRL would likely recognize this as creating additional anxiety and a disincentive for further complaints.

While under Title VII, MTA- NYCT would like to present their actions as not having met the threshold for a "materially adverse" action due to (according to their argument) lack of direct changes to Christine's salary or title. However, under NYCHRL, the combination of administrative pressures, punitive labeling, and disregard for Christine's health and safety create a retaliatory environment that could reasonably deter someone from continuing to report

workplace issues. NYCHRL's standard recognizes that even seemingly minor administrative or procedural actions can create a hostile environment and discourage employees from asserting their rights.

D. Distinction Between Title VII's "Materially Adverse" Standard and NYCHRL's Broader "Deterrence-Based" Standard

The Court's evaluation of Plaintiff's claims solely under Title VII's "materially adverse" standard does not account for the broader protections afforded under the New York City Human Rights Law (NYCHRL), which recognizes that even minor adverse actions or procedural barriers can qualify as retaliation if they are reasonably likely to deter an employee from engaging in protected activity. Under NYCHRL, Plaintiff need only demonstrate that retaliation was a "motivating factor" in the adverse actions taken by Defendant, as opposed to Title VII's stricter requirement of "but-for" causation. *See Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 31-32 (1st Dep't 2009).

Defendant's motion attempts, unsuccessfully, to dismiss Plaintiff's legitimate complaints as mere slights. Plaintiff argues the following actions by Defendant make clear Defendant's motion must be denied.

The difference between Title VII and NYCHRL's standards can be applied directly to Plaintiff's experience with MTA- NYCT. Following her complaints regarding the lack of telecommuting accommodations and the refusal to address technical issues with her work laptop, Plaintiff experienced a series of actions by MTA- NYCT that would likely deter a reasonable person from continuing to make complaints:

1. **Classification as "AWOL" Despite Communication of Medical Leave as Adverse Actions**

   After Plaintiff communicated her medical leave to her supervisors, Defendant continued to classify her as "AWOL." Under Title VII, the defendant might have presented this classification as a procedural designation without direct impact on Plaintiff's salary, benefits, or core job responsibilities and may therefore not meet the "materially adverse" standard. However, under NYCHRL, this classification would be viewed as retaliatory, as it is reasonably likely to dissuade a reasonable employee from engaging in protected activity by creating a stigma around her professional standing and reputation.

   Defendant's classification of Plaintiff as AWOL, despite knowledge of her documented sick leave status, materially impacted her employment status. Under NYCHRL, this action is sufficient to support a claim of retaliation, as it could deter a reasonable person from further engaging in protected activity. *See Williams v. N.Y.C. Dep't of Educ.*, 19 Misc. 3d 1101[A].

   Despite being notified by Plaintiff via text and by her daughter, Defendant falsely claimed that Plaintiff had no communication with NYCT between December 31, 2020, and January 27, 2021. This misrepresentation is not only inaccurate but also indicative of Defendant's intent to tarnish Plaintiff's record and undermine her claims. Defendant's insistence on labeling Plaintiff as "AWOL" despite clear evidence of her sick leave demonstrates its retaliatory objective to discredit her.

2. **Falsification of Plaintiff's Attendance Record as "AWOL" and Withholding of Pay**

   In January 2021, Defendant falsely recorded Plaintiff as "AWOL" despite being notified

of her sick leave status by both Plaintiff and her daughter. Plaintiff also communicated her sick leave to Labor Relations via her attorney, who confirmed her status to Defendant's representatives. By misclassifying Plaintiff's absences as "AWOL" despite clear communication of her medical status, Defendant sought to damage her professional record and create grounds for disciplinary action, further evidencing retaliatory animus.

MTA- NYCT falsely claimed Knight had no communication with NYCT from December 31, 2020, through January 27, 2021, despite being notified of her illness by Plaintiff and her daughter on January 4, 2021. Plaintiff's attorney directly communicated with Labor Relations on January 27, 2021, regarding her sick leave and intent to retire. Defendant's classification of Plaintiff as AWOL, withholding of pay, and refusal to sign retirement forms reveal its intention to disparage Plaintiff and retaliate against her.

3. **Retaliation in Response to Plaintiff's Sick Leave Request**

NYCHRL recognizes retaliation broadly, including actions indirectly related to complaints about workplace treatment. Defendant's insistence on unnecessary procedural steps for Plaintiff's sick leave, along with its refusal to recognize Plaintiff's documented high-risk COVID-19 status, demonstrates actions likely to deter any reasonable employee from making future complaints. *See Thoreson v. Penthouse Intl., Ltd.*, 80 N.Y.2d 490, 496 (1992).

4. **Repeated Requests for Telecommuting Compliance Despite Known Technical Issues**

MTA- NYCT's insistence that Plaintiff submit telecommuting forms, despite her inability to perform certain duties due to unresolved IT issues, created unreasonable pressure and potential entrapment. Title VII's "materially adverse" standard may have been argued that

it does not consider this action sufficient for retaliation, as it does not directly alter Plaintiff's position, pay, or long-term career path. However, under NYCHRL, the demands for compliance with unfeasible conditions would be considered retaliatory, as they reasonably could discourage any employee from continuing to voice concerns if they fear being set up to fail.

Defendant repeatedly demanded that Plaintiff submit telecommuting plans while aware her work laptop was nonfunctional. NYCHRL's flexible standard recognizes that retaliatory motives need not be "objectively" proven through Title VII's stringent lens; instead, Plaintiff need only show that Defendant's conduct could reasonably be perceived as retaliatory. Defendant's refusal to support Plaintiff's telecommuting needs despite allowing other employees to work remotely is actionable under NYCHRL's broader interpretation. *See Farage v. Diamond,* 105 A.D.3d 478, 478 (1st Dep't 2013).

Defendant consistently pressured Plaintiff to submit weekly telecommuting plans while fully aware that her work laptop lacked the required applications (Talon and CMS) necessary for her job. Defendant's insistence on compliance, knowing it was technically impossible without these applications, created a coercive and hostile environment intended to pressure Plaintiff into either submitting false statements or failing to comply, which could be used against her. Plaintiff reasonably refused to falsify these forms, and Defendant's relentless pressure to complete unfeasible tasks constitutes a retaliatory tactic intended to isolate and intimidate her.

5. **Denial of Work-from-Home Flexibility Due to Equipment Limitations**

Defendant denied Plaintiff's work-from-home flexibility due to unresolved equipment

issues while allowing other employees to work remotely. Defendant argues that Title VII might not recognize this as "materially adverse" because it does not constitute a tangible alteration in Plaintiff's job status or salary. However, under NYCHRL, this treatment could qualify as retaliatory, as it subtly creates a hostile environment likely to deter Plaintiff from further complaints, especially given that Plaintiff's health risks were not considered.

Plaintiff's colleague, Elvis James, was permitted to work from home without similar demands, highlighting Defendant's biased treatment and disparate accommodations, underscoring a clear pattern of retaliation and discrimination under NYCHRL.

Under NYCHRL, refusing accommodations like remote work—especially when those accommodations are provided to other employees—can qualify as retaliation. Defendant's denial of telecommuting accommodations despite knowing Plaintiff's equipment issues created unnecessary obstacles, which NYCHRL recognizes as retaliatory. *See Albano v. Schering-Plough Corp.*, 912 N.Y.S.2d 598, 599 (1st Dep't 2010).

6. **Unaddressed IT Issues Used as Basis for Retaliation**

Despite Plaintiff's numerous attempts to have her work laptop fixed and functioning, Defendant failed to provide effective technical support, instead placing the burden on Plaintiff to "get it fixed." IT technician DeShawn informed Plaintiff that the laptop required a WiFi connection, which was unavailable at her worksite, and instructed her to test it at home. Defendant's ongoing failure to provide functional equipment, coupled

with the expectation that Plaintiff would resolve issues outside her control, reveals a calculated effort to create grounds for further retaliatory action.

7. **Pretextual OATH Charges Filed in Response to Plaintiff's Complaints**

In January 2021, Defendant manufactured charges against Plaintiff, alleging that she failed to submit required telework plans and failed to report to the Coney Island office. These charges ignored the reality that Plaintiff's laptop was nonfunctional due to unresolved technical issues. Defendant's issuance of OATH charges based on these known facts demonstrates a clear retaliatory intent to undermine Plaintiff's position and credibility by creating a fabricated disciplinary record in response to her ongoing complaints and legal claims.

Defendant's OATH charges were filed within close proximity to Plaintiff's complaints, suggesting a retaliatory motive under NYCHRL. Even if these charges appear procedurally proper, NYCHRL permits scrutiny of whether they were motivated by retaliatory animus, especially given the close temporal connection to Plaintiff's protected activity. *See Johnson v. Strive E. Harlem Empl. Grp.*, 990 F. Supp. 2d 435, 448 (S.D.N.Y. 2014).

8. **Pressure to Sign Telecommuting Forms Despite Known Technical Issues**

Defendant consistently pressured Plaintiff to submit weekly telecommuting plans from April through December 2020, a period spanning 10 months, while fully aware that her work laptop lacked the required applications (Talon and CMS) necessary for her job.

Defendant's insistence on compliance, despite knowing it was technically impossible for Plaintiff to meet these demands, created a coercive and hostile environment. This sustained pressure was intended to force Plaintiff into either submitting false statements or failing to comply, both of which could be used against her. Plaintiff reasonably refused to falsify these forms, and Defendant's relentless demands over this extended period to complete unfeasible tasks represent a calculated retaliatory tactic designed to isolate and intimidate her, and undermine her professionally.

9. **Approval to Work from Home Then Sudden Directive to Report to Office**

On December 29, 2020, Plaintiff's supervisor J. Balkaran agreed she could work from home to test her laptop, per IT's instructions that WiFi was needed to determine if the necessary applications could run. Plaintiff traveled to her home in Delaware with the understanding that she could perform this task remotely. However, despite having authorized this arrangement, Defendant abruptly ordered Plaintiff to return to the office the next day, exemplifying an unreasonable demand designed to disrupt her work-life stability and retaliate against her. Defendant's decision to reverse its approval without regard for Plaintiff's circumstances reflects a retaliatory pattern of control.

10. **Failure to Process Plaintiff's Retirement Documentation and Withholding of Pay**

Plaintiff's attorney notified Defendant of her intent to retire on January 29, 2021, and requested the necessary documentation be processed. Although Defendant's representative agreed to facilitate this, Defendant failed to process her retirement paperwork and withheld her accrued pay for January. The withholding of her pay and benefits placed Plaintiff in financial distress, furthering the retaliatory environment

created by Defendant's refusal to honor its commitment and apply standard procedures in processing her retirement.

Defendant's refusal to process Plaintiff's retirement, despite agreeing to do so in communication with Plaintiff's attorney at the Labor Relations Meeting January 27, 2021, and the withholding of her earned leave pay further demonstrate Defendant's intention to inflict harm and hardship on Plaintiff during the COVID-19 pandemic.

11. **Persistent Demands Despite High-Risk COVID-19 Status and Exhaustion**

Throughout the COVID-19 pandemic, Defendant ignored Plaintiff's documented health risks and doctor's notes, demanding she return to the office while other employees worked from home. The ongoing emotional distress and exhaustion inflicted on Plaintiff by Defendant's relentless pressure left her with no choice but to protect her safety by remaining home. Defendant's disregard for Plaintiff's well-being underscores a retaliatory, hostile work environment designed to force her into submission.

12. **Refusal to Pay Payroll Lag Time**

Upon Plaintiff's retirement, Defendant refused to pay the payroll lag time to which all retirees are entitled. This denial was unprecedented and unjustified, further underscoring Defendant's retaliatory motive to punish Plaintiff for her protected activity and complaints. Payroll lag time is a standard entitlement, and Defendant's refusal to pay demonstrates a targeted effort to harm Plaintiff.

### 13. Illegal Withholding of Biweekly Salary

In January 2021, while Plaintiff was out sick for 17 workdays, Defendant withheld Plaintiff's biweekly salary for the entire month. This blatant and illegal withholding of pay, totaling approximately $25,000, was never justified or explained. Despite repeated efforts to resolve the matter, Defendant has failed to provide any reason for this egregious denial of Plaintiff's earned compensation.

### 14. Permanent Financial Impact

Defendant's retaliatory withholding of Plaintiff's legitimate earnings and time accrual has had far-reaching consequences. By failing to release these funds, Defendant has effectively reduced Plaintiff's pension and social security benefits for the remainder of her life. These reductions in lifetime income are a direct result of Defendant's vindictive actions, which aimed to deter Plaintiff from continuing to assert her legal rights and raise complaints.

These actions are emblematic of a retaliatory campaign designed to create financial distress, undermine Plaintiff's dignity, and discourage further protected activity. Under the broader protections of NYCHRL, such adverse actions—individually and collectively—are reasonably likely to deter a person from engaging in protected activity and constitute clear retaliation. The lasting financial harm caused by Defendant's deliberate actions further underscores the severity of the retaliation Plaintiff endured. Defendant's motion attempts, unsuccessfully, to dismiss Plaintiff's legitimate complaints as mere slights. Plaintiff argues the adverse actions by Defendant make clear Defendant's motion must be denied.

**E. Proximity in Time: Evidence of Retaliatory Intent**

The close temporal proximity between Plaintiff Christine Knight's complaints and the adverse actions taken by MTA - New York City Transit (MTA - NYCT) underscores a clear inference of retaliatory intent under NYCHRL's broad standard for retaliation claims. The following timeline and associated facts demonstrate the escalating nature of retaliatory conduct in response to Plaintiff's protected activities:

1.      2017: Plaintiff Files an EEOC Complaint Regarding Unpaid Overtime

Plaintiff repeatedly requested payment for mandated overtime from J. Angerami, who not only denied her requests but also approved a higher overtime percentage (8%) for male colleague C. Wong while limiting Plaintiff's to 4%. After Plaintiff escalated her complaint to the EEOC and was referred to the Department of Labor, Defendant eventually paid her, but only after an 18-month delay. This pattern of withholding rightful compensation created financial and emotional hardship, laying the groundwork for retaliatory behavior that persisted into subsequent years.

2.      March 13, 2019: Plaintiff Files Federal Lawsuit

Plaintiff's federal lawsuit (Exhibit 41 to the Dermesropian Decl. (ECF 109)), initiated after receiving her right-to-sue letter on December 7, 2018, triggered a series of retaliatory actions, including heightened scrutiny and micromanagement by supervisors such as J. Angerami and D. McClean. Defendant began targeting Plaintiff with administrative roadblocks and undue scrutiny that escalated over time.

3.      March 16–18, 2020: Forced to Report to Work Amid COVID-19

Despite Governor Cuomo's directive for all non-essential employees to stay home, Defendant singled out Plaintiff, forcing her to work in person while allowing other employees to telecommute. Plaintiff's documented concerns about her high-risk health status were ignored, further demonstrating Defendant's retaliatory disregard for her safety. This decision not only contravened state directives but also reflected Defendant's deliberate targeting of Plaintiff, as her peers were permitted to work from home.

4.      April–December 2020: Coercion and Harassment Regarding Telecommuting Forms

After the onset of the pandemic, Defendant pressured Plaintiff to submit telecommuting forms despite knowing her work-issued laptop lacked the necessary applications (Talon and CMS) required for her job. Defendant's repeated demands, knowing that Plaintiff could not comply due to technical limitations outside her control, created a hostile environment. This coercive tactic, coupled with Defendant's failure to resolve the technical issues, amounted to sustained retaliation intended to discredit and intimidate Plaintiff.

5.      September 29, 2020: Plaintiff Raises COVID-19 Safety Concerns

Plaintiff emailed management, including J. Angerami and J. Santamaria, detailing her health concerns and increased risk of exposure due to unsafe workplace conditions. In retaliation, Defendant escalated adverse actions, including the October 28, 2020 revocation of her telecommuting privileges, forcing Plaintiff to work in person under unsafe conditions, despite her documented high-risk status.

6.      November 2020: Large Workplace Gatherings Amid Pandemic

Plaintiff lodged additional complaints to management about how their violation of COVID-19 protocols is negatively impacting her health. Soon after, Defendant filed pretextual OATH charges against Plaintiff, alleging dereliction of duty and insubordination. These charges were clearly intended to retaliate against Plaintiff for her complaints and to discredit her as an employee.

7.      December 31, 2020: AWOL Classification

Defendant falsely classified Plaintiff as AWOL during her sick leave, despite being notified of her absence and receiving medical documentation. This action occurred just weeks after Plaintiff submitted additional complaints about workplace safety and harassment, underscoring the retaliatory nature of the designation.

8.      January 2021: Withholding of Salary and Accrued Benefits

Defendant withheld Plaintiff's entire January 2021 salary, totaling approximately $25,000, and failed to process her retirement paperwork in a timely manner. This punitive measure directly followed Plaintiff's continued advocacy for her rights and complaints about workplace retaliation, further evidencing a pattern of reprisal.

9.      January 27–28, 2021: Lockout from Office

On Plaintiff's return to work to finalize her retirement, Defendant changed the locks to her office, barring her from accessing personal belongings and creating unnecessary obstacles. This action, coupled with the withholding of her salary and accrued benefits, was a blatant attempt to further intimidate and retaliate against Plaintiff during her final days of employment.

Compelling Proximity Argument under NYCHRL Retaliation Claims

The sequence of events demonstrates that Plaintiff's protected activities—ranging from filing EEOC complaints to advocating against workplace discrimination and harassment —were met with immediate and escalating adverse actions by Defendant. Notably, the retaliatory conduct intensified after the onset of the COVID-19 pandemic, when Plaintiff was coerced to sign telecommuting forms despite known technical challenges and repeatedly subjected to unsafe working conditions. These retaliatory measures, including the false AWOL classification and the withholding of pay, occurred within weeks or months of Plaintiff's documented complaints, creating a clear inference of causation.

Under NYCHRL's expansive standard, which considers whether an employer's actions would be reasonably likely to deter a reasonable person from engaging in protected activity, Plaintiff's claims demonstrate a clear pattern of retaliation. The temporal proximity between Plaintiff's protected activity and Defendant's adverse actions, supported by documentary evidence, strongly indicates retaliatory intent.

1. Protected Activities and Defendant's Retaliatory Responses

• Protected Activities:

• Plaintiff engaged in several protected activities, including filing EEOC complaints, submitting internal grievances, and requesting reasonable accommodations during the COVID-19 pandemic. Specifically:

• Plaintiff filed formal complaints in 2018 and submitted additional complaints through 2020 addressing her exclusion from promotions and unsafe working conditions.

• Plaintiff raised concerns directly with management about COVID-19 safety violations and requested accommodations based on her high-risk status.

• Adverse Actions in Response:

Following these protected activities, Defendant undertook a series of adverse actions, including:

• Issuing a series of baseless disciplinary charges, including fabricated AWOL classifications and OATH charges shortly after Plaintiff's documented sick leave and her requests for telecommuting accommodations.

• Failing to provide Plaintiff with operational tools to telecommute, such as a properly configured laptop, and subsequently revoking her telecommuting privileges based on those technical deficiencies.

• Assigning Plaintiff to in-person work under unsafe conditions during the COVID-19 pandemic, despite allowing similarly situated employees to work remotely.

2.      Pattern of Retaliation Demonstrated Through Evidence

• Protected Activity(1): In January 2019, Plaintiff received an email from Defendant then-President Andy Byford, who assured her that the Equal Employment Opportunity (EEO) office would conduct a "proper investigation" into her ongoing complaints of discrimination and retaliation. This email, which also copied Joel Andrews, V.P. EEO, demonstrates that Defendant had direct notice of Plaintiff's protected activity and acknowledged the seriousness of her allegations (Exhibit 40 to the Dermesropian Decl., ECF 109). The

acknowledgment of an investigation further indicates that Plaintiff's concerns were elevated to senior management and that her complaints were being scrutinized internally.

Protected Activity(2): In March 2019, Plaintiff escalated her efforts by filing a federal lawsuit, further solidifying Defendant's knowledge of her protected activity and heightening the scrutiny of her allegations. The combination of the EEO investigation and the federal lawsuit placed Plaintiff's complaints squarely before the Defendant.

Retaliatory Action: In September 2019, just months after Defendant's assurance of an investigation regarding Plaintiff's complaints and the filing of Plaintiff's federal lawsuit, Defendant unlawfully and incorrectly marked Plaintiff as AWOL despite her notification that she was out sick for the day. This misclassification resulted in Plaintiff suffering a direct financial penalty due to the loss of pay. ((Exhibit 61 to the Dermesropian Decl. (ECF 109)) Knight's Dep. Tr. 141:4-15). Such punitive action, directly following her protected activity, underscores the retaliatory intent behind Defendant's conduct.

Evidence of Retaliatory Intent: Defendant's abrupt and unjust action was a stark deviation from established protocols and standard practices, revealing a targeted effort to create adverse conditions for Plaintiff and demonstrating a retaliatory response to Plaintiff's protected activity. The AWOL designation was not an isolated error but part of a broader pattern of retaliatory conduct. The timing—mere months after the Defendant EEO investigation was promised to Plaintiff  and the federal lawsuit was filed—strongly supports the inference that Defendant's actions were motivated by Plaintiff's protected activity.

Additionally, the misclassification of Plaintiff as AWOL despite her compliance with proper procedures reflects an effort to intimidate and dissuade her from pursuing further complaints.

This adverse action, coupled with Defendant's heightened awareness of Plaintiff's legal and administrative challenges, creates a compelling narrative of retaliation under NYCHRL's broader protections.

Under NYCHRL, which broadly protects against any conduct likely to deter protected activity, Defendant's actions, including the AWOL misclassification and resulting financial harm, constitute actionable retaliation. The close temporal proximity between Plaintiff's protected activity and the retaliatory response reinforces the connection between the two and satisfies the NYCHRL standard for proving retaliation. The timing of the retaliatory action closely following Defendant's commitment to investigate Plaintiff's complaints bolsters the inference that the AWOL designation was not a mere administrative error but a deliberate act of retaliation. Under NYCHRL, which broadly protects against any action likely to deter protected activity, this conduct constitutes actionable retaliation.

•    Protected Activity: On November 1, 2019, Plaintiff sent a detailed complaint to her managers' superiors, including Joel Andrews, V.P. EEO; Chief Mechanical Officer John Angerami; and George Thomas, regarding ongoing discrimination and retaliation (Exhibit 42 to the Dermesropian Decl., ECF 109). This complaint outlined some of her concerns about discriminatory practices and the retaliatory treatment she had been subjected to in the workplace.

Retaliatory Action: In December 2019, shortly after this protected activity, Plaintiff worked overtime as a test monitor, an assignment arranged by Defendant. Plaintiff notified her supervisor, J. Balkaran, prior to accepting the assignment, as was standard practice. However, Defendant failed to process Plaintiff's overtime payment for this work. Plaintiff was not made aware that Defendant disregarded her time entry entirely and did not approve the payment, a

deviation from past practice ((Exhibit 61 to the Dermesropian Decl. (ECF 109))(Plaintiff's Dep. Tr. 157:20-158:03; 160:8-12).

This refusal to process payment occurred despite Defendant being the party to assign the overtime job, and Plaintiff was forced to escalate the issue before her overtime payment was addressed. Plaintiff asserts that she was being targeted and that this unjustified withholding of payment was retaliatory and part of the hostile environment she experienced after lodging her complaints of discrimination and retaliation. ((Exhibit 61 to the Dermesropian Decl. (ECF 109))(Plaintiff's Dep. Tr. 161:8-12; 162:20-22).

The timing of this adverse action, in close proximity to Plaintiff's protected activity, is consistent with NYCHRL's expansive interpretation of retaliation, which does not require a showing of "material adversity" but focuses on whether the employer's actions are reasonably likely to deter an employee from engaging in protected activity. The unjustified denial of payment for work Plaintiff was assigned by Defendant, coupled with the ongoing hostile work environment, exemplifies retaliatory conduct under NYCHRL

Retaliatory Action: Plaintiff's several protected activities played a role in the escalation of retaliatory actions. In March 2020, Plaintiff was forced to physically report to the Coney Island shop on March 16, 17, and 18, 2020, while her similarly situated non-essential peers complied with the March 15, 2020 memorandum allowing them to work from home. The memorandum explicitly stated that non-essential employees must stay home for at least two weeks, regardless of telecommuting capabilities (Exhibit 48 to the Dermesropian Decl., ECF 109). Plaintiff's classification as a non-essential employee made her eligible to stay home, yet she was

deliberately forced into unsafe working conditions, endangering her health during the COVID-19 pandemic (Knight's Dep. Tr. 169:8-170:19, 173:4-8).

3.    Proximity of Protected Activity to Retaliatory Actions

•    Proximity in Time

The series of adverse actions Plaintiff experienced shortly after engaging in protected activity underscores Defendant's retaliatory intent under NYCHRL.

Protected Activity: In November 2020, Plaintiff submitted another complaint to her supervisors about the unjust treatment she was subjected to, including being assigned to the Motor Shop without receiving any instructions or directives, effectively setting her up to fail. Her similarly situated colleagues, however, were permitted to work remotely without such obstacles (Exhibit 44 to the Dermesropian Decl., ECF 109).

Retaliatory Action: In December 2020, Defendant revoked Plaintiff's telecommuting privileges following her protected activities and refused to provide the necessary equipment or guidance to ensure her success in remote work assignments (Exhibit 54 to the Dermesropian Decl., ECF 109). This revocation further highlights Defendant's calculated attempt to isolate Plaintiff and deter her from further engaging in protected activity.

These adverse actions, taken in close proximity to Plaintiff's complaints and legal actions, demonstrate a clear retaliatory intent. The revocation of telecommuting privileges and the failure to provide necessary resources for remote work, coupled with the decision to force Plaintiff to physically report to work during the pandemic, show a pattern of discriminatory treatment aimed at creating intolerable working conditions.

Material Impact:

Defendant's treatment of Plaintiff raises serious issues of material fact. The refusal to accommodate Plaintiff in line with the March 15, 2020 memorandum's directives, while accommodating similarly situated employees, demonstrates disparate treatment and retaliatory motive. Moreover, Defendant's targeted actions were likely to deter Plaintiff from continuing to engage in protected activity, satisfying the NYCHRL standard for proving retaliation.

This temporal connection between Plaintiff's protected activities and Defendant's adverse actions further strengthens the argument for allowing Plaintiff's retaliation claims under NYCHRL to proceed to trial.

- Timeline of Retaliatory Conduct:

- Plaintiff's November 2020 submission of medical documentation requesting remote work accommodations was quickly followed by the revocation of her telecommuting privileges and a series of disciplinary charges in December 2020 and January 2021.

- December 2020, Email communications regarding Plaintiff's teleworking plans and subsequent documentation of Defendant's refusal to approve accommodations or respond to Plaintiff's requests despite medical reasons provided to Defendant (Exhibit 58 to the Dermesropian Decl. (ECF 109).

- Defendant's refusal to address workplace safety concerns raised by Plaintiff in November 2020, despite evidence of COVID-19 protocol violations at work, demonstrates continued retaliation. (Exhibit 45 to the Dermesropian Decl., ECF 109).

• Defendant's escalation of disciplinary actions in January 2021 occurred shortly after Plaintiff's complaints about workplace safety and her sick leave documentation.

4. Defendant's Actions Likely to Deter Protected Activity

• Under NYCHRL's broad standard, Defendant's conduct—ranging from withholding critical tools to perform her job remotely, fabricating disciplinary charges, and revoking her telecommuting privileges—was calculated to intimidate Plaintiff and deter her from pursuing her claims.

• The targeting of Plaintiff with onerous requirements, such as in-person work during a global pandemic while denying her reasonable accommodations, further supports the inference of retaliatory intent.

5. Conclusion

The combination of Plaintiff's protected activities, Defendant's swift and adverse responses, and the documentary evidence of escalating disciplinary actions demonstrates a clear pattern of retaliation. Plaintiff respectfully requests that the Court grant her Motion for Reconsideration, allowing her NYCHRL retaliation claims to proceed to trial, where these issues can be fully explored and adjudicated.

Under NYCHRL's expansive interpretation, these retaliatory actions are actionable because they would deter a reasonable employee from engaging in protected activity. Plaintiff respectfully requests that the Court consider this clear proximity in time as strong evidence of Defendant's retaliatory motive and allow her NYCHRL retaliation claims to proceed to trial.

**F. Implications of Defendant's Failure to Address NYCHRL Claims in Summary Judgment**

1. **Waiver of Defense Argument**

   Courts frequently find that failure to specifically address a claim in summary judgment can constitute waiver or forfeiture of the defense regarding that claim. Although MTA-NYCT mentioned NYCHRL in its initial summary judgment motion, its failure to respond to Plaintiff's NYCHRL arguments in its reply (pp. 28-31) signals an inadequate defense and could be treated as partial waiver, warranting the denial of summary judgment on these claims. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197 (2d Cir. 2014) (finding waiver where a party failed to specifically address certain claims at summary judgment).

2. **Differing Legal Standard Under NYCHRL**

   NYCHRL's more lenient standard requires that Defendant's alleged actions be analyzed for whether they would "deter a reasonable person from engaging in protected activity." *See Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009). By failing to address Plaintiff's NYCHRL-specific arguments in reply, Defendant left these claims uncontested under a standard that could allow them to proceed based on broader protections than Title VII. Thus, Defendant's focus solely on Title VII in reply was inadequate, reinforcing the need for this Court to reconsider its ruling.

3. **Viewing Evidence in Light Most Favorable to Plaintiff**

   At the summary judgment stage, the Court must view the evidence in the light most favorable to Plaintiff. MTA- NYCT's failure to engage with NYCHRL claims in its reply leaves the Court with a record that favors Plaintiff, as it implies a lack of robust defense

on these claims. This supports denial of summary judgment and allows Plaintiff's claims to proceed to trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

4. **Judgment Limited to Title VII**

   Defendant's reliance on Title VII standards, without addressing NYCHRL's broader protections, means the Court should not dismiss the NYCHRL claims based solely on federal standards. Courts have ruled that claims under NYCHRL require separate analysis due to its unique protections, warranting preservation of the NYCHRL claims for trial. *See Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 470 (S.D.N.Y. 2013).

5. **Inference of Lack of Defense on NYCHRL Claims**

   MTA- NYCT's failure to address NYCHRL-specific claims opens the door for Plaintiff's argument that Defendant lacks substantive grounds to challenge these claims. Courts may view this as an insufficient defense, supporting denial of summary judgment on Plaintiff's NYCHRL claims. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

**Comparison of Standards in Summary**

Under Title VII's "materially adverse" standard, while the Court may have determined MTA-NYCT's actions might not rise to the level of adverse employment actions due to the lack of direct impact on Plaintiff's salary, title, or job duties, however, under NYCHRL's broader deterrence-based standard, each of these actions—administrative labeling as "AWOL," coercive demands for telecommuting compliance, and refusal to accommodate Plaintiff's work-from-home needs despite COVID-19 concerns—constitutes a series of adverse actions that would likely deter a reasonable employee from engaging in protected activity.

Furthermore, in this case, Defendant's inconsistencies in addressing Plaintiff's numerous complaints suggest an attempt to obscure the retaliatory motive that likely influenced their treatment of Plaintiff. These denials and contradictory explanations not only undermine Defendant's credibility but also reinforce the plausibility of retaliatory intent. Under the broader protections of NYCHRL, such inconsistencies strengthen Plaintiff's retaliation claim, as they highlight Defendant's efforts to mask retaliatory actions that were reasonably likely to deter Plaintiff from engaging in protected activity.

These distinctions between Title VII and NYCHRL highlight the need for the Court to reconsider Plaintiff's retaliation claims under NYCHRL's more protective standard. Plaintiff respectfully requests that her NYCHRL retaliation claims be allowed to proceed to trial, where a jury can evaluate the retaliatory intent and the cumulative effect of Defendant's actions.

## **CONCLUSION**

In light of NYCHRL's expansive interpretation, Defendant's retaliatory actions—including its coercive demands for telecommuting compliance, denial of necessary accommodations, pretextual disciplinary charges, and adverse employment status changes—are actionable. Defendant's explanations for the adverse action and retaliation amount to excuses and nothing more. Such excuses are a mere pretext for Defendant's discriminatory conduct. Defendant's reliance solely on Title VII standards fails to address NYCHRL's broader protections. Plaintiff respectfully requests that the Court grant her Motion for Reconsideration, allowing her NYCHRL retaliation claims to proceed to trial, where a jury can determine the extent of Defendant's retaliatory actions.

Defendant's conduct reflects a clear pattern of retaliatory actions intended to intimidate, isolate, and pressure Plaintiff for engaging in protected activity. Defendant's insistence on telework forms despite known technical obstacles, its abrupt revocation of telework privileges, the falsification of Plaintiff's attendance record, and the issuance of baseless disciplinary charges collectively demonstrate a hostile environment designed to deter Plaintiff from pursuing her legal rights. Defendant's repeated inconsistencies regarding Plaintiff's numerous complaints and their failure to provide clear, substantive responses to Plaintiff's allegations further suggest an effort to obscure the retaliatory motive behind their actions. These contradictions not only undermine Defendant's credibility but also strengthen the inference of retaliatory intent under NYCHRL's broad protections.

Under NYCHRL's broad retaliation protections, such actions are sufficient to support a claim for retaliation, as they demonstrate a targeted effort to discredit and force Plaintiff into resignation during a time of heightened health risks due to the COVID-19 pandemic. Defendant's failure to substantively address Plaintiff's NYCHRL claims, combined with extensive evidence of retaliatory actions, demonstrates a clear need for reconsideration. Plaintiff has shown that Defendant's conduct—including coercive telework demands, unfounded AWOL classifications, selective refusal to provide remote accommodations, and an orchestrated pattern of harassment and pressure by multiple managers—created a hostile work environment that would deter a reasonable employee from engaging in protected activity. These actions are consistent with NYCHRL's broader protections and reflect a targeted effort by Defendant to discredit, mistreat, withhold pay and force Plaintiff into resignation during a time of heightened health risks due to

the COVID-19 pandemic. Moreover, Plaintiff has produced sufficient evidence to show the reasons proffered by Defendant are pretextual.

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Motion for Reconsideration and allow Plaintiff's NYCHRL claims to proceed to trial, given that Defendant failed to adequately address these claims in their reply, effectively waiving their arguments. In the interest of justice and consistent with the broader protections of NYCHRL, Plaintiff's claims merit presentation to a jury for full consideration of Defendant's retaliatory actions and their impact on Plaintiff.

Dated: November 23, 2024

New York, New York

Respectfully submitted,

By: ___/s/ *Christine N. Knight*_____

**Christine N. Knight**

28 Pony Court

Smyrna, DE 19977

(917) 674-7300

4yomind@gmail.com